The **PEOPLE** of the State of Colorado, Plaintiff–Appellant.

v.

Kevin Franklin **ELMARR,** Defendant–Appellee.

No. 07SA379.

Supreme Court of Colorado, En Banc.

April 21, 2008.

Mary T. Lacy, District Attorney, Twentieth Judicial District, William F. Nagel, Assistant District Attorney, Boulder, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Colorado State Public Defender, Kristin Johnson, Deputy State Public Defender, Nicole Collins, Deputy State Public Defender, Boulder, Colorado, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal taken pursuant to C.A.R. 4.1, we review an order from the Boulder County District Court suppressing statements the defendant made in response to police interrogation. We find that the trial court properly suppressed the defendant's statements because the defendant was in custody while interrogated, and it is con-

ceded that he did not receive proper *Miranda* warnings before that custodial interrogation. We therefore affirm the trial court's suppression order and remand for further proceedings.

## I. Facts and Procedural History

On Sunday, May 24, 1987, Detectives Ferguson and Haugse of the Boulder Sheriff's Department and Officer Stiles of the Longmont Police Department visited Defendant Kevin Franklin Elmarr at his home to inform him that his ex-wife, Carol Murphy, was found dead the day before. According to the testimony before the trial court, the detectives were not in uniform, and their weapons were holstered. Officer Stiles was in uniform, but was present more as a friend of Elmarr's family to aid in the notification of death. Two other police officers—Captain Epp and Lieutenant Hopper—later arrived at Elmarr's home in another unmarked police car and were seen there by Elmarr, but they stayed outside.

Detectives Ferguson and Haugse spoke with Elmarr at his home and Elmarr disclosed that he had visited with his ex-wife the day before she was found dead, and had taken her for a ride on his motorcycle. Shortly after this disclosure, Detective Ferguson said the police had more questions for him, and asked him if he would mind accompanying them to the Sheriff's Department at the Boulder Justice Center for further questioning; Elmarr agreed. The detectives drove Elmarr to the Sheriff's Department in their unmarked police car, with Elmarr in the back seat. The detectives did not provide Elmarr the option of driving himself to the station. Elmarr was not handcuffed.

During the drive to the Sheriff's Department, Elmarr volunteered that he had not been entirely truthful in his earlier conversation with the detectives, and provided further information regarding his meeting with his ex-wife the day before she was found dead. The detectives did not say anything while in the car.

The detectives arrived at the Sheriff's Department through the garage in the basement, which is a secure area not open to the public. They escorted Elmarr into an elevator that led to the Sheriff's Department Detective Bureau, which is also not open to the public. Witnesses were unable to recall whether Elmarr was searched before entering the building, but Captain Epp testified that it was standard procedure for persons to be patted down before being transported. Based on this testimony, the trial court found that Elmarr was subjected to a pat-down search upon arrival at the Sheriff's Department. The trial court also found that Elmarr was then placed in a closed interview room measuring seven by ten feet, and told to stay there until officers returned. Captain Epp and Lieutenant Hopper subsequently interrogated Elmarr in that interview room. During the interrogation, Elmarr was seated against the wall, while Captain Epp and Lieutenant Hopper were seated in front of the door. The officers were dressed casually, but the trial court found that they were carrying their weapons according to the testimony at the suppression hearing. Though the interview room door had a lock on it, no one could recall if it was locked while Elmarr was in the room.

Witnesses testified that Elmarr was never handcuffed or otherwise directly physically restrained, but no one ever told Elmarr that he was free to leave or that he was not under arrest. The interrogation was audio– and video-taped, and the recording shows that Captain Epp began his interrogation by advising Elmarr that he did not have to talk to the police, that he had a right to remain silent, that anything he said that incriminated him would be taken down, and that he had a right to an attorney.[1] Captain Epp then asked if Elmarr wanted to talk to them then. Elmarr answered "sure," and then began speaking about the last time he saw his ex-wife.

Captain Epp then questioned Elmarr about the details of that last meeting with his ex-wife. Though Captain Epp spoke rather

---

1. The trial court found that Captain Epp's purported *Miranda* warning was deficient because it did not include the advisement that Elmarr could have an attorney appointed if he could not afford one; the People do not challenge that finding on appeal.

slowly and softly, he soon began expressing his doubts about Elmarr's story. For instance, early in the interview Captain Epp told Elmarr, "I hope you're telling me the truth...." Later he inspected what he thought were scratches on Elmarr's arms.

Approximately halfway into the interview, Lieutenant Hopper took over much of the questioning, and his tone was more aggressive. He asked Elmarr if he ever thought of hurting his ex-wife; why witnesses would say they saw his ex-wife on a motorcycle matching Elmarr's near the place where her body was found; and whether his ex-wife was "all right" the last time he saw her. Lieutenant Hopper again asked Elmarr why he initially lied when interviewed at his house, asking, "Were you lying because you were afraid that you would be incriminated more and more?" He followed by stating, "You need to think about some of these answers pretty hard," prompting Elmarr to respond, "It seems to me like you guys are trying to say I did it." Lieutenant Hopper then continued his questioning, telling Elmarr that his story was "just not accurate," and warning him "don't be lyin' to us now. Don't be fool enough to build barriers, it's goin' to crumble right down on ya." Later, Elmarr repeated that he felt he was being accused of murder, and Lieutenant Hopper answered, "[Y]ou've lied to us already.... Put yourself in our place. What would you, what would you think if you were us?"

The recording also shows that near the end of the interrogation, which lasted almost an hour, Captain Epp resumed his questioning, telling Elmarr, "I just get the feeling that you are holding something back." When Elmarr wondered aloud whether he should get a lawyer[2] and protested that he was telling the truth, Captain Epp responded, "Well, I'm not sure. I've got reason to believe that something, that some points here that you're not." Shortly thereafter Lieutenant Hopper explicitly asked Elmarr whether he killed his ex-wife, and Elmarr denied it. Elmarr then said, "I think I would like to talk to a lawyer." At this point the officers

stated the interview was over, opened the door, and left the room. They testified that the entire interrogation lasted approximately fifty minutes.

However, Elmarr remained in the Sheriff's Department. The recording shows that he was kept in the interview room for a period of time, after which one of the officers returned and asked him if he would like to take a polygraph test. Elmarr demurred and again stated he wanted to talk to an attorney. The officer left. After a further wait, yet another officer entered the interview room, stated that he wanted to take some photographs of Elmarr, and asked if Elmarr would mind removing his clothes for those pictures, adding, "You really don't have a choice right now...." Elmarr complied, after which he asked, "When do I get to go home?" The officer responded, "Shortly here, I hope." Elmarr then asked to make some calls to his family and the officer left, returning later to escort Elmarr out of the interview room to make his calls. Afterwards, Elmarr was escorted back into the interview room, and in the videotape one can hear the door close again. Elmarr again asked how long he would be there, and was told, "At least until your lawyer calls." After a further wait, Elmarr's attorney entered the interview room and the videotape ended, almost an hour after Captain Epp and Lieutenant Hopper had terminated their formal interrogation.

Captain Epp testified that Elmarr was "allowed to leave" after he consulted with his attorney. Elmarr was not charged with a crime until almost twenty years later, when in January 2007 he was arrested and charged with first degree murder for the murder of his ex-wife Carol Murphy. Elmarr moved the trial court to suppress the statements he made to police twenty years earlier in his home, in the police car on the way to the Sheriff's Department, and in the Sheriff's Department interview room. The trial court declined to suppress the statements made at Elmarr's home and in the police car, and Elmarr does not challenge those rulings on

---

**2.** The People conceded that this was a sufficient invocation of the right to counsel, and that inter-

rogation should have ceased at this point.

appeal. However, the trial court suppressed all of the statements Elmarr made at the Sheriff's Department, finding that they were all the product of custodial interrogation.

Because there was no dispute that Elmarr was interrogated, the trial court focused on whether Elmarr was in custody while at the Sheriff's Department. In concluding that Elmarr was indeed in custody, the trial court made the following findings: (1) Elmarr was subjected to a pat-down search upon arrival at the Sheriff's Department; (2) Elmarr was provided with (albeit deficient) *Miranda*-type warnings typically given when a suspect is in custody; (3) Elmarr was placed in a seven-by-ten-foot interview room and told to stay there until the officers returned; (4) Elmarr was interrogated for at least fifty minutes by officers carrying weapons; (5) Captain Epp likely suspected that Elmarr was involved in Carol Murphy's murder and was attempting to elicit incriminating statements from him; (6) Captain Epp and Lieutenant Hopper used a "good-cop-bad-cop" technique upon Elmarr; (6) Elmarr was never handcuffed or overtly restrained, but was never told he was free to leave. Accordingly, the trial court found that Elmarr was subjected to custodial interrogation without a proper *Miranda* warning and waiver, such that all statements after the purported *Miranda* waiver were inadmissible except for impeachment purposes.[3]

## II. Analysis

In their interlocutory appeal, the People request that we reverse the trial court's suppression of Elmarr's statements. They argue that Elmarr was not in custody when he was interrogated at the Sheriff's Department, and that the trial court made erroneous factual findings and considered irrelevant evidence in reaching its conclusion. We find that the trial court erroneously considered the police officers' subjective intent in determining whether Elmarr was in custody, but that the court's other factual findings are supported by the record. We hold that those findings, coupled with the undisputed evidence in the record, establish that Elmarr

was in custody when he was interrogated at the Sheriff's Department. Accordingly, we affirm the trial court's suppression order and remand for further proceedings consistent with this opinion.

## A. Standard of Review

A trial court's determination of whether a suspect was in custody is a mixed question of law and fact. *People v. Matheny,* 46 P.3d 453, 462 (Colo.2002). Thus, we defer to the trial court's findings of historical facts, if supported by the record. *Id.* However, we review de novo the legal question of whether those facts, taken together, establish that the suspect was in custody when interrogated. *Id.*

In this case, the Sheriff's Department interrogation of Elmarr was video– and audio-taped, but additional facts relevant to the question of custody were determined according to testimony before the trial court. Thus, we defer to the trial court's determination of disputed facts in that record, if supported. *Id.* However, our analysis is not constricted by only those facts that were the subject of the trial court's order; we also consider the undisputed facts evident in the record. *See People v. Valdez,* 969 P.2d 208, 211 (Colo.1998) ("When the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to *de novo* review.").

## B. The Trial Court's Factual Findings Are Supported by the Record

The People first argue that the trial court's factual findings are not supported by the record. Specifically, the People challenge the trial court's findings that Elmarr was subjected to a pat-down search upon arrival at the Sheriff's Department, that he was directed to stay in the interview room while waiting to be interrogated, and that Captain Epp and Lieutenant Hopper both had weapons on them.

We are not persuaded by the People's arguments. The witnesses at the suppression hearing gave contradictory evidence re-

---

3. The trial court found the statements were admissible for impeachment because they were

made voluntarily; Elmarr does not challenge that ruling on appeal.

garding if or exactly where Elmarr waited before being interrogated, and whether the officers had weapons on their persons during the interrogation; the trial court properly exercised its discretion in resolving those factual disputes. *See People v. Traubert,* 199 Colo. 322, 327, 608 P.2d 342, 345–46 (1980). There is no basis to overturn those findings.

As to whether Elmarr was subjected to a pat-down search upon arrival at the Sheriff's Department, Captain Epp testified that he did not know whether that happened, but that it was "probably standard procedure for the officers to conduct a pat down search before they transported him." Thus, there was sufficient evidence to support the trial court's finding that Elmarr was subjected to a pat-down search before being interrogated. Furthermore, Captain Epp's testimony is ambiguous as to whether it would have been standard procedure to search Elmarr before being transported in the car to the Sheriff's Department, or before being transported through the Sheriff's Department to the interview room. There was arguably sufficient evidence, given the context of Captain Epp's answer, to support the trial court's finding. We need not reach that issue because regardless of whether Elmarr was searched before being driven to the Sheriff's Department or upon arriving there, our legal analysis of the custody issue would be the same.

Thus, we conclude there was sufficient evidence in the record to establish the operative facts as found by the trial court.

### C. Elmarr Was in Custody When He Was Interrogated

■ For purposes of determining whether *Miranda* warnings are required, a suspect is in custody when his or her "freedom of action is curtailed to a 'degree associated with formal arrest.'" *People v. Polander,* 41 P.3d 698, 705 (Colo.2001) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). In assessing the question of custody, we consider such factors as the time, place, and purpose of the interrogation; the persons present during the interrogation; the words the officers spoke to the suspect; the officers' tone of voice and general demeanor; the length

and mood of the interrogation; whether any restraint or limitation was placed on the suspect's movement during interrogation; the officers' response to any of the suspect's questions; whether directions were given to the suspect during interrogation; and the suspect's verbal or nonverbal responses to such directions. *Matheny,* 46 P.3d at 465–66. None of these factors is determinative, and the question of custody is determined in light of the totality of the circumstances. *People v. Dracon,* 884 P.2d 712, 717 (Colo. 1994).

■ However, because the test of custody is an objective one, unarticulated thoughts or views of the officers and suspects are irrelevant. *See Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); *Matheny,* 46 P.3d at 468. Thus, the People are correct in their argument that the trial court erred when, in determining whether Elmarr was in custody, it relied (in part) upon the finding that Captain Epp likely suspected that Elmarr was involved in Carol Murphy's murder and attempted to elicit incriminating statements from him. That finding has no relevance to the custody question. We therefore review de novo whether the trial court's other factual findings, and the undisputed evidence in the record, establish that Elmarr was in custody. *See Matheny,* 46 P.3d at 468 (performing same analysis and ignoring trial court's reliance on subjective factors).

Our analysis is guided by precedent considering somewhat analogous facts. For instance, in *California v. Beheler,* officers asked the suspect to accompany them to the police station, transported him there, informed him he was not under arrest, and questioned him for less than thirty minutes before he voluntarily left the police station. 463 U.S. 1121, 1122, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The court found that these facts established that the suspect was not in custody. *Id.* at 1126, 103 S.Ct. 3517. Similarly, in *Oregon v. Mathiason,* the offi-

cers asked the suspect to come to the police station to be interviewed. The suspect drove himself to the station, was immediately told he was not under arrest, was told that he was a suspect in a crime, and interviewed for approximately thirty minutes behind closed doors in an interview room before he left the station voluntarily. 429 U.S. 492, 493–94, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Again, the court found the suspect was not in custody. *Id.* at 495, 97 S.Ct. 711. We came to the same conclusion in *Matheny,* where the suspect was asked to come to the police station to be interviewed, drove himself and the police officers to the station, was escorted to an interview room, was told he was free to leave and not under arrest, and then was interviewed for approximately an hour and a half. 46 P.3d at 456–57, 467.

In *People v. Trujillo,* however, we found that a suspect was in custody where he was asked to come to the police station for an interview and drove himself to the station; upon arrival, he was never told he was free to leave or not under arrest, was asked accusatory questions for over an hour and a half, was asked to submit to a mug shot and a polygraph test, and was asked to produce certain evidence to the police. 784 P.2d 788, 789–90, 792 (Colo.1990). Similarly, in *Dracon* we found the suspect was in custody where she agreed to accompany officers to the police station, riding in the front seat of the police car, and was taken through a non-public area to an office and questioned for almost three hours; she was never told she was free to leave or not under arrest, and was made to wait for another three hours in the police station before being interviewed yet again. 884 P.2d at 714–15, 717. Finally, we found that a suspect was in custody in *People v. Minjarez,* where police officers came to the hospital where the suspect's child was being treated, asked nurses to bring him to a hospital interview room the officers had procured, directed the suspect to sit in a chair away from the closed door, and told the suspect he was free to go but then subjected him to aggressive interrogation— consisting of leading questions and accusations of guilt—for twenty of the forty-five minutes of the interview. 81 P.3d 348, 351–52, 357 (Colo.2003).

■ Precedent does not provide a neat formula for deciding the case at hand, and indeed there can be no such formula as each case will present novel factual patterns not previously addressed. We have provided some general rules, however. On the one hand, we have heeded the warning that one is not in custody "simply because the questioning takes place in the station house." *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *see Matheny,* 46 P.3d at 468. On the other hand, an officer's statement that a suspect is "free to leave" is not sufficient to establish that an interview is non-custodial, when all the external circumstances appear to the contrary. *See Minjarez,* 81 P.3d at 357.

Though the case at hand presents a close question, we find that Elmarr was in custody while interrogated by officers in the Sheriff's Department in 1987. No one fact leads us to this conclusion, but rather the totality of the circumstances combine to create a custodial atmosphere. Though Elmarr was asked to accompany police officers to the station for questioning, such a question does not necessarily make the event voluntary, as one could interpret the question to be one where "no" is not an available answer—especially in the circumstances present here. It is significant that Elmarr was transported in the back of a police car to the non-public area of the Sheriff's Department, where he was directed to wait and then interrogated in a small, closed-door interview room. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(d), at 735 (3d ed. 2007) ("If the so-called 'invitation' [to an interview at the police station] involves the person going to the station in the company of the police, then a finding of custody is much more likely."). Importantly, he was never told he was not under arrest, or that he was free to leave. In fact, the trial court found that Elmarr was instructed to wait for officers in a closed room, and was thereafter interrogated at length in that room.

Furthermore, it is significant that Elmarr was subjected to aggressive interrogation, where the interrogators expressed doubts regarding his truthfulness, discounted his denials, confronted him with potential evidence of his guilt, and accused him of committing

murder. *See id.,* § 6.6(f), at 751 ("And surely a reasonable person would conclude he was in custody if the interview is close and persistent, involving leading questions and the discounting of the suspect's denials of involvement."). Such interrogation by multiple officers in a small room isolated from others helped create a sense of custody. The custodial atmosphere continued after Elmarr requested an attorney—even then, he was kept in the closed-door [4] interview room and was asked about his willingness to submit to a polygraph test, and then was directed to disrobe for photographs, about which he was told, "You really don't have a choice." All of these factors combined to prompt Elmarr to ask the reasonable question, "When do I get to go home?" All of these facts lead to the conclusion that Elmarr's freedom of action was curtailed to a degree associated with formal arrest, and a reasonable person under those circumstances would feel that he was in custody.[5] *See Polander,* 41 P.3d at 705.

### III. Conclusion

We conclude that all of Elmarr's statements to the police at the Boulder Sheriff's Department in 1987 were the product of custodial interrogation. Because it is conceded that Elmarr did not receive a proper *Miranda* warning, all of those statements must be suppressed. Accordingly, we affirm the trial court's suppression order, and remand for further proceedings consistent with this opinion.

Justice COATS and Justice EID dissent.

Justice COATS, dissenting.

While the statements suppressed by the majority today are all ostensibly exculpatory in nature, and the majority's rationale for suppressing them is so case-specific as to have little precedential value, I believe the persistent unwillingness of this court to be guided by the United States Supreme Court in this matter of federal constitutional law merits some comment. I also consider it important to once again highlight the extra burden imposed upon the search for truth in this jurisdiction by the needless suppression of a defendant's own calculated attempts to shift blame away from himself. I therefore briefly explain my reasons for dissenting.

I purposely refer to these statements as being "suppressed by the majority" because even the majority acknowledges that the trial court simply applied an incorrect legal standard, mistakenly believing the custody question to turn on the subjective intent of the police. Although the majority rightly notes that both the applicable legal standard and the trial court's application of that standard are largely matters of law, subject to de novo review by this court, the majority extends the notion of "de novo review" to include not only assessing the legality of a lower court's actions but actually ordering suppression for reasons of its own. And although the factors upon which the majority relies are so generic as to apply to almost any interview at a police station, regardless of consent, I nevertheless consider problematic the majority's perfunctory approval of the trial court's fact-finding.

Because the defendant, who was clearly present and could have contradicted the officers on any disputed points, chose not to testify in support of his motion, a number of the trial court's key factual findings were based simply on its presumptions about typical police practice and were absolutely unsupported by any evidence of the actual events in this case. In particular, the trial court (apparently relying on Captain Epp's statement that although he was not present, it would probably have been standard procedure to pat down a suspect before trans-

---

4. In the videotape in the record, one can hear the door open and close each time officers enter and leave.

5. The People argue that if the interrogation of Elmarr was custodial, it only became so toward the end of the interview, so that only statements after that point could be suppressed. However, there is no discrete point at which one could say that a non-custodial interview suddenly became custodial. It is the totality of the circumstances, from the time Elmarr was put in a police car until the time he was finally released hours later, that makes the encounter custodial. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (noting that the suspect was released at end of interview, as part of analysis of whether interview was custodial).

porting him) found that the defendant was subjected to a pat-down search, despite the unequivocal testimony of the only officer present that the defendant was not touched, either before he was driven to the station or upon arrival there. Equally significant, and equally unsupported, was the court's finding that the defendant was "placed" in a small, closed interview room and "told to wait" there. The only relevant evidence indicated that the defendant was "asked" to wait while Epp coordinated with the detectives who had previously spoken with the defendant; that no witness could recall whether the defendant waited in a break room or in someone else's office; and that the videotape showed the defendant entering the interview room along with Epp and Hopper, as the interview began. While the trial court, as trier of fact, could certainly disbelieve particular testimony, it was not empowered to invent evidence from whole cloth.

Most troublesome, however, is the majority's refusal to apply the very legal standard it purports to accept. Almost a quarter-century ago, the United States Supreme Court made clear that a suspect is not placed in custody for purposes of the *Miranda* requirements merely by being seized and subjected to an investigatory stop. *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Rather, the prophylactic *Miranda* warnings are triggered only when a suspect's liberty has been infringed upon to an extent commensurate with a formal arrest. *Id.* And interrogation at a police station, as long as it is consensual, does not constitute a seizure of any kind, much less a seizure tantamount to an arrest. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *California v. Beheler,* 463 U.S. 1121, 1124–25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

This jurisdiction was late in acknowledging the distinction between a seizure of the defendant's person and custody for purposes of *Miranda, see, e.g., People v. Cleburn,* 782 P.2d 784, 786–87 (Colo.1989) (continuing to find custody whenever a reasonable person would feel not free to leave); *see generally* William F. Nagel, *The Differences Between the U.S. Supreme Court and the Colorado Supreme Court on the Test for the Determination of Custody for Purposes of Miranda,* 71 Denv. U.L.Rev. 427 (1994), and when finally forced to acknowledge the Supreme Court's holdings in *Berkemer, Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), and *Behler,* we dismissed them as merely reflecting a "fact-specific approach" to the question of custody. *See People v. Trujillo,* 938 P.2d 117, 119 n. 2 (Colo. 1997). Despite grudgingly conceding that *Miranda* is triggered only by a show of force traditionally associated with an arrest, characterized by actions like drawing and pointing weapons, handcuffing, and conducting searches that exceed the limits of a weapons pat-down, *see, e.g., People v. Breidenbach,* 875 P.2d 879, 886 (Colo.1994); and eventually even coming to mouth the words of the Supreme Court's standard, *see, e.g., People v. Matheny,* 46 P.3d 453, 465–66 (Colo.2002), we seem never (as evidenced by today's holding) to have fully embraced the concept.

Once again the majority fails to distinguish objective indications that a suspect has effectively been arrested from indications of a potential suspect's interest in avoiding that eventuality. In the former case, any statements made without an effective waiver of *Miranda* warnings are presumptively the product of police coercion. In the latter, whether motivated more by a desire to assist the investigation or to avoid attracting further suspicion, no such presumption arises. Comparing voluntary witness statements and real evidence is not only a legitimate but in fact a highly desirable and effective technique for solving crimes.

In the absence of actual indicia of an arrest, the majority marshals a laundry list of circumstances or factors, indicative of little more than an interview at the police station. The fact that interview rooms are typically neither large nor public, that two officers are present for an interview, or that they close the door for privacy indicate virtually nothing about the voluntariness of an interviewee's presence. As the Supreme Court has expressly noted, the fact that questioners carry holstered side-arms indicates only that they are police officers, which is understood by

the interviewee when he consents to a stationhouse interview. *United States v. Drayton*, 536 U.S. 194, 205, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). And rather than being an indication of arrest, riding in a police car, only after giving consent and without having been patted-down or handcuffed, would suggest to any reasonable person precisely the opposite.

In the absence of an objectively manifested change in circumstances, the fact that a defendant who is present by agreement is not expressly told that he is free to leave has little meaning; and it seems more than a little disingenuous to suggest it as a worthy practice in light of the trial court's adverse reaction to the police reminder that the defendant was free not to speak with them. To the extent that circumstances actually did change at some point as a result of the defendant's responses, he clearly felt free to, and did, terminate the interview, and only his earlier statements are at issue here. In fact, the majority's substantial reliance on events following termination of the interview is a further indication of its failure to grasp, or at least its failure to apply, the objective standard dictated by the Supreme Court. In the absence of any indication that they already intended, and had already communicated their intent, to arrest him, the subsequent actions of the officers could have no bearing whatsoever on the defendant's perception of his status at the time of his statements.

With its mechanical counting of virtually meaningless factors and its comparisons with fact patterns considered by this court long before the Supreme Court's modern custody jurisprudence became clear to us, I can only assume the majority either fails to appreciate the import of that jurisprudence or despite it, continues to harbor reservations about the use of a defendant's own words to establish his guilt. In either case, I believe the majority's holding today conflicts with the Supreme Court's interpretation of the United States Constitution; can serve only to dissuade law enforcement officers from seeking and preserving a record of voluntary witness interviews; and needlessly hinders the search for truth in the criminal process.

I therefore respectfully dissent.

Justice EID, dissenting.

I would reverse the trial court's order suppressing Elmarr's statements and therefore respectfully dissent from the majority's opinion. In my view, the trial court made two significant and fundamental errors in this case.

First, the court found that the incomplete *Miranda* warnings given by the officers created custody:

> [F]rom the moment [the defendant] was advised of his *Miranda* rights, Defendant was in custody for the purposes of *Miranda.* ... Defendant was advised of *Miranda* at the very beginning of the questioning, which would indicate to someone familiar with the criminal process that he was being deprived of his freedom....

In so holding, the court got it exactly backwards. *Miranda* warnings do not create custody. *See* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(f), at 752 (3d ed. 2007) ("The argument that the giving of some of the *Miranda* warnings itself establishes that the situation was custodial has been rightly rejected ...."); *see also United States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir.1998). Instead, custody triggers *Miranda*. *See People v. Stephenson*, 159 P.3d 617, 623 (Colo.2007). As a noted commentator has suggested, it would be "bizarre" to penalize police officers for attempting to give *Miranda* warnings in situations that were later determined by a court to be noncustodial. LaFave et al., *supra*, § 6.6(f), at 752.

The second fundamental error committed by the trial court is the fact that it relied on the officers' subjective intentions in its analysis of whether Elmarr was in custody, concluding that "Captain Epp likely suspected that Defendant was involved in the murder and intended to attempt to elicit incriminating statements from Defendant." As the majority recognizes, and Elmarr acknowledges, the subjective intentions of the officers in questioning the defendant have no role in determining whether the defendant was in custody. Maj. op. at 1161; *see also People v. Matheny*, 46 P.3d 453, 468 (Colo.

2002) (concluding that the trial court erred by relying on the officers' subjective intent).

These two errors tainted the entirety of the trial court's analysis and render its fact-finding, upon which the majority relies, suspect. *See* maj. op. at 1163–1164. In my view, we should correct the trial court's errors and remand the case for further proceedings. *See People v. Arias,* 159 P.3d 134, 141 (Colo.2007) (Eid, J., dissenting). For this reason, I respectfully dissent from the majority's opinion.