JUSTICE HART delivered the Opinion of the Court.
¶1 Robert Hull Marko asks this court to reverse his convictions for first degree murder and sexual assault for two reasons. First, he argues that the trial court impermissibly denied his request to strike a juror for cause because of that juror's views on the defense of not guilty by reason of insanity. Second, he argues that he was in custody and under interrogation before he was informed of his rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), such that certain statements he made should have been excluded at trial. Because we disagree with both of Marko's contentions, we affirm the decision of the court of appeals, though on different grounds.
¶2 We hold that the trial court did not abuse its discretion in denying Marko's challenge for cause to the prospective juror because the trial court sufficiently rehabilitated the juror through individual questioning during voir dire. We therefore do not reach the question whether our decision in People v. Novotny , 2014 CO 18, 320 P.3d 1194, applies retroactively. As to the statements Marko made at the beginning of his interview with the civilian police, we conclude that they were properly admitted because he was not in custody at the time he made the challenged statements.
I. Background and Procedural History
¶3 Nineteen-year-old J.L. was reported missing after she failed to return home on the evening of October 10, 2008. Following a search of the family computer, officers from the El Paso County Sheriff's Office (EPCS)
*610 determined that J.L. received a message on October 9, through an online social-network platform, from a person with the username "Rex290." The message suggested that the two "get together" the following day. The police identified "Rex290" as Robert Hull Marko, a soldier stationed at Fort Carson.
¶4 The EPCS officers contacted the military police officers (MPs) at Fort Carson and asked that the MPs speak with Marko to determine whether he knew J.L.'s whereabouts. In the early morning of October 11, the MPs conducted a "missing persons and welfare check" at Marko's barracks. J.L. was not in the barracks, and Marko denied knowing her.
¶5 Subsequently, the civilian police received information that J.L. had been seen with Marko in the past. The police then went to the provost marshal's office (PMO) at Fort Carson and asked to speak with Marko directly. Following standard base policy, the MPs picked Marko up at his barracks and transported him to the PMO in handcuffs. The handcuffs were removed before the interview with the civilian police began, and Marko was told by the civilian police that he was not under arrest and was free to leave. At the outset of the interview, Marko again denied knowing the victim. But after repeatedly changing his story, he eventually admitted that he knew J.L. and saw her on October 10.
¶6 The EPCS officers conducted additional interviews with Marko throughout the day on October 11, as well as on October 12 and 13. On October 13, Marko led the officers to J.L.'s body. Marko admitted that he drove into the mountains with J.L. the morning of October 10, where they argued. He said he knocked J.L. unconscious and sexually assaulted her, before cutting her throat with a knife and leaving her body in a wooded area.
¶7 The People charged Marko with first degree murder after deliberation, first degree felony murder, sexual assault, and other crimes, to which he pleaded not guilty and not guilty by reason of insanity (NGRI). At trial, the jury rejected Marko's NGRI defense and convicted him of first degree murder after deliberation, two counts of sexual assault, and two counts of attempted sexual assault as crimes of violence.
¶8 Marko appealed his convictions. As relevant here, he argued that the trial court erred in denying his challenge for cause of a prospective juror, Juror C, who made several concerning statements during voir dire about the NGRI defense, including a statement that he would require "overwhelming" evidence of insanity before finding a person not guilty by reason of insanity. Marko also contended that the trial court should have suppressed statements he made to the EPCS officers prior to being advised of his Miranda rights because he was in custody at the time he made them. In particular, he argued that because the MPs transported him to the interview with the EPCS officers and a reasonable person in the military would regard himself as being ordered to submit to the EPCS officers' questioning, the entire initial interview was a custodial interrogation.
¶9 A division of the court of appeals affirmed Marko's convictions. People v. Marko , 2015 COA 139, ¶ 248, 434 P.3d 618. Without addressing whether it was error to deny Marko's for-cause juror challenge, the division held that, under Novotny , Marko failed to "establish a reasonable probability that any error contributed to the verdict" warranting reversal. Id. at ¶ 21. The division also concluded that, under the totality of the circumstances, Marko was not in custody during the pre-advisement portion of his initial interview with the EPCS officers. Id. at ¶¶ 60-70. The division recognized that Marko was taken to the PMO in handcuffs and "arguably would have felt that, under the military command structure, he was under an order to go to the station...." Id. at ¶ 61. Marko was informed, however, "at the outset of the interview that he was not under arrest and was free to go at any time." Id. For that reason, the division agreed with the district court that Marko was not in custody at the time of the challenged questioning. Id .
¶10 We granted certiorari to review these issues.[1]
*611 II. Analysis
¶11 We begin our analysis by considering whether the trial court erred in denying Marko's challenge for cause to Juror C. After examining the circumstances surrounding the voir dire of Juror C, we cannot conclude that the trial court's decision to deny Marko's challenge was arbitrary, unreasonable, or unfair. Indeed, despite Juror C's initial concerning comments, he was sufficiently rehabilitated by the conclusion of his individual questioning. Because we conclude that there was no error in denying Marko's juror challenge, we need not decide today whether Novotny applies retroactively, or what showing would be required to mandate reversal.
¶12 We next consider whether it was error to admit statements Marko made during the pre-advisement portion of the October 11 interview with the EPCS officers. We consider the context of the interview itself as well as the inherent pressures associated with the military command structure and the circumstances that surrounded Marko's delivery to the civilian police for questioning. Ultimately, we conclude that, under the totality of the circumstances, Marko was not in custody before he was advised of his Miranda rights, so the challenged statements were properly admitted.
A. Juror Challenge
¶13 Marko contends that the trial court violated his right to a fair trial by an impartial jury by denying his challenge for cause to Juror C. We disagree.
1. Relevant Facts
¶14 During voir dire, the trial court instructed the panel of prospective jurors that Marko had pleaded not guilty by reason of insanity and noted that the prosecution had the burden of establishing beyond a reasonable doubt that Marko was legally sane at the time he allegedly committed the offenses.
¶15 The trial court and the attorneys later questioned several members of the prospective juror panel about their responses to written questionnaires. During this questioning, Juror C expressed concerns that the NGRI defense is too often used by defendants to "excuse" their behavior. The trial court explained the legal definition of insanity and asked whether Juror C would be able to return an NGRI verdict if the prosecution did not meet its burden at trial. He responded, "I think I'd still have a tough time with it." He also stated that the evidence needed to prove insanity would have to "be so overwhelming[ ] from a doctor's point of view, psychologist, whoever you would have up there for me to go with, okay, he was definitely insane."
¶16 The following exchange then took place:
Trial Court: Nobody is asking you to accept it on less than proof. But in terms of proof, if the issue of insanity comes up during the course of trial, the Prosecution has to disprove it. You'd still have to be satisfied before you could return a verdict of not guilty by reason of insanity that met the definition. If it does meet the definition, then fairness says the Defendant is entitled to a finding of not guilty by reason of insanity. If it doesn't, then, of course, nobody would expect you to return a verdict of not guilty by reason of insanity. And we're asking you to set those notions aside that you have [ ] probably from TV and base your decision on what you hear in court. Would you be able to do that?
Juror C: I think so.
Trial Court: I am not trying to just put words in your mouth. Do you feel so strong about the issue of sanity that you would never be able to return a verdict of not guilty by reason of insanity?
*612 Juror C: Once again, I honestly can't answer that. I can't say one way or the other. I've never been in a position like this before. I feel pretty strong about what I put down there simply because it's-it just seems like people get off too easy these days. I could go shoot someone and say I was insane and get off?
Trial Court: No, not because you said it. I suppose if somebody proved it during the course of trial, maybe you'd be entitled to be, if you were that level, not just because you said you were insane. What I'm asking people to do is see if they cannot prejudge the case and wait to hear the evidence, and you would have to be satisfied that the Defendant was truly insane at the time of the commission of the offense before you could find he was not guilty by reason of insanity.
It's still the Prosecution's burden. It doesn't make a difference in that respect how it comes in, but we're not going to have the chance to re-ask this question in three weeks. You'd have to tell us now whether you could do it. Would you be able to do it, return a verdict of not guilty by reason of insanity to a serious crime if you felt the Defendant was insane at the time?
Juror C: Yes.
¶17 After this back-and-forth, and further questioning of Juror C by the attorneys, defense counsel challenged Juror C for cause, arguing that he would be unable to set aside his personal beliefs about the NGRI defense and that "he would have a hard time following the burden of proof." The trial court denied the challenge, stating that
[Juror C] was very honest about what he was saying. The problem that he's had and everybody has had, part of which is my fault, is nobody knows what the definition in Colorado of insanity is. So we're dealing with a very amorphous concept at this point that seems to be fed by media and bad secondhand reports from people that somebody is somehow getting off easily based on just saying they were insane.
The Colorado definition of insanity is very strong. It requires a showing of considerable dysfunction. So in the end, when we straightened out with him that he would have to be satisfied that it met the burden of insanity under Colorado law and not just general concepts and he wouldn't have to accept anything on faith but, rather, the evidence and testimony, he said, I think very candidly, that he could return a verdict of not guilty by reason of insanity. And based on his demeanor and everything else he said and the sincerity with which he showed it, I believe that's what he would do.
At the end of voir dire, the trial court provided the prospective jurors with the legal definition of NGRI to help alleviate "a number of" concerns about the defense.
¶18 The following day, defense counsel further questioned Juror C, who indicated that the legal definition of insanity had helped him better understand the defense:
Defense Counsel: [Juror C], we already talked. Anything we talked about yesterday? Are you stuck on something we talked about yesterday?
Juror C: No. The definitions really helped a lot. It gave me time to sleep on it and think about it. It's one of those situations that we really do have to set aside our personal feelings and let the facts guide you. I said last night it's all about the facts. If the facts are there, I'll succumb to them and give fair judgment. It really helps hearing everything else I heard today.
Defense Counsel: So you're fine following the law. You're fine keeping the burden on that table.
Juror C: Absolutely.
¶19 Defense counsel again challenged Juror C for cause. In denying the challenge, the court stated that "any problem [Juror C] had yesterday was certainly extinguished today" because "once he had heard the instruction on what insanity was ... he was more open-minded or more receptive to the concept of not guilty by reason of insanity." Defense counsel used a preemptory challenge to remove Juror C, and he did not sit on the jury.
1. The Trial Court Did Not Err in Denying Marko's Challenge for Cause
¶20 The due process clauses of the United States and Colorado Constitutions afford *613 every criminal defendant the right to a fair trial by an impartial jury. See U.S. Const. amends. VI, XIV ; Colo. Const. art. II §§ 16, 25. To ensure that right is protected, the trial court must exclude from the jury persons who are prejudiced or biased as well as those who are "unwilling or unable to accept the basic principles of criminal law and to render a fair and impartial verdict based upon the evidence admitted at trial and the court's instructions." Morrison v. People , 19 P.3d 668, 672 (Colo. 2000) ; see also Nailor v. People , 200 Colo. 30, 612 P.2d 79, 80 (Colo. 1980).
¶21 A prospective juror's expression of concern or indication that he or she possesses a preconceived belief as to some aspect of the case does not, however, mandate exclusion of that juror for cause. People v. Drake , 748 P.2d 1237, 1243 (Colo. 1988) ; People v. Sandoval , 733 P.2d 319, 321 (Colo. 1987). In fact, we have explained that "jurors who initially misunderstand the law should not be removed for cause if, after explanation and rehabilitative efforts, the court believes that they can render a fair and impartial verdict based on the instructions given by the judge and the evidence presented at trial." People v. Clemens , 2017 CO 89, ¶ 16, 401 P.3d 525, 529. Rather, a trial court must evaluate the prospective juror's state of mind by assessing (1) the juror's responses to questions posed by either counsel or the court and (2) the demeanor and body language of the juror throughout voir dire. Id. If the trial court ultimately concludes that the prospective juror's state of mind evinces "enmity or bias" toward the defendant or the state, the trial court must exclude the juror. § 16-10-103(1)(j), C.R.S. (2018). But a juror should not be excused for cause if the court is ultimately convinced that the juror will impartially follow the law:
[N]o person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.
Id.
¶22 We review a trial court's denial of a challenge of a juror for cause for an abuse of discretion. Morrison , 19 P.3d at 672. We accord great deference to the trial court's decision because the trial judge is the "only judicial officer" capable of making an in-person determination of "the credibility and demeanor of a prospective juror." Drake , 748 P.2d at 1243. Because appellate courts are limited to a cold record on review, the trial judge is in a superior position to evaluate the "juror's credibility, demeanor, and sincerity in explaining his or her state of mind." Morrison , 19 P.3d at 672. A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. Clemens , ¶ 13, 401 P.3d at 529.
¶23 With these legal standards in mind, we consider Marko's contention that the trial court erred in denying his challenge for cause because Juror C could not fairly apply the law with respect to the insanity defense. Marko points particularly to Juror C's initial remark that evidence of insanity would have to be "overwhelming" before he could conclude that the prosecution's burden had not been satisfied. Marko argues that the court failed to rehabilitate Juror C as to his ability to appropriately follow the law as instructed on the NGRI defense, and, therefore, Juror C should have been removed for cause. We disagree.
¶24 The trial court's findings are supported by the record, and we thus defer to its conclusion that Juror C was willing and able to serve as an impartial juror and capable of applying the law relating to the NGRI defense. True, Juror C made several concerning comments regarding the NGRI defense at the outset of his individual questioning. His comments reflected a skepticism about whether defendants exploit the defense to avoid punishment and a concern that the defense was too easy to prove. But the trial court, after noting that "media and bad secondhand reports" contributed to misunderstandings about the NGRI defense, explaining what the legal standards for the defense were and, after evaluating Juror C's comments *614 and demeanor during their colloquy, was satisfied that Juror C could apply the law as instructed. The court specifically observed that "[Juror C] said, I think very candidly, that he could return a verdict of not guilty by reason of insanity. And based on his demeanor and everything else he said and the sincerity with which he showed it, I believe that's what he would do." This is precisely the type of in-person assessment that appellate courts are loath to second-guess on the paper record.
¶25 Under the totality of the circumstances, we cannot conclude that the trial court's denial of Marko's challenge for cause to Juror C was arbitrary, unreasonable, or unfair. Although Juror C initially expressed concerns about following the law and instructions of the trial court concerning the insanity defense, the trial court sufficiently rehabilitated him through its questioning. Ultimately, Juror C assured the court and counsel that he could "[a]bsolutely" apply the law as instructed. This satisfied the trial court, and we see no reason to second-guess that decision. Accordingly, we affirm the judgment of the court of appeals, albeit on different grounds.
A. Custodial Interrogation
¶26 Marko contends that the trial court erred in admitting statements he made to the EPCS officers before he was advised of his Miranda rights. Again, we disagree. Because Marko was not in custody when the challenged statements were made, those statements were properly admitted.
1. Relevant Facts
¶27 In the early morning hours of October 11, after determining that J.L. had communicated through social media with an account registered to Marko, an EPCS officer asked the MPs at Fort Carson to speak with Marko to determine whether he knew where J.L. was. Two MPs and a sergeant reported to Marko's barracks and asked him to come to the parking lot to discuss whether he knew J.L. The MPs requested Marko's identification and conducted a pat-down search to check for weapons. They then escorted Marko back to his barracks and performed a cursory search of his room. No items were touched, moved, or inspected, and Marko was not restrained in any manner. Throughout this interaction, Marko maintained that he did not know J.L.
¶28 At approximately 2:00 a.m. that morning, two EPCS officers went to the MP's office at Fort Carson where they informed the on-shift supervisor that, based on additional information they had received about a relationship between Marko and J.L., they wanted to speak with Marko to determine whether he had been in contact with J.L. Pursuant to base standard protocol, MPs were to collect Marko from his barracks and escort him to the PMO for the interview requested by the civilian police.
¶29 Two MPs arrived at Marko's barracks at 2:23 a.m. One MP advised Marko that he was needed for questioning concerning J.L. and that they were going to take him to the PMO. The MPs performed a pat-down search for weapons and placed Marko in handcuffs, before transporting him two miles in their patrol vehicle to the PMO. Marko asked whether he was under arrest. The MPs told Marko that he was not and that the use of handcuffs during transport was "just common practice." Upon arrival at the PMO, Marko's handcuffs were removed, and he was led into the interview room to meet with two EPCS officers.
¶30 The interview room was small and windowless with one door that was closed but unlocked during the interview. Only Marko and the two EPCS officers remained in the room. Marko and one officer sat at the interview table, and the other officer sat between the table and the door. At the beginning of the interview, one of the EPCS officers told Marko that he was not under arrest and that he was free to go at any time. Marko indicated that he understood and agreed to speak to the EPCS officers.
¶31 The officers then informed Marko that they were investigating a missing person, named J.L., and that they had reason to believe he knew her. As he had done when first contacted by the MPs, Marko initially denied knowing J.L. However, after one of the EPCS officers showed Marko online messages *615 between the two, he admitted that he had previously communicated with J.L. but denied that he had seen her recently. The officers told Marko that they did not believe him, confronted him with additional information contradicting his statements, and told him that he needed to be honest.
¶32 Marko ultimately admitted that he had a sexual relationship with J.L. and saw her on October 10. He then offered several differing accounts of what occurred when he met J.L. on that date. Eventually, he landed on the story that J.L. was in his car that day, they drove around, and then he dropped her off at a vacant building. This disclosure occurred about forty minutes into the interview. At that point, 3:26 a.m., the officers advised Marko of his Miranda rights. After that advisement, and two additional days of questioning, Marko ultimately confessed to incapacitating, sexually assaulting, and then killing J.L.
¶33 Before trial, Marko filed several motions to suppress statements, including those he made between 2:23 a.m. and 3:26 a.m. on October 11. As to those statements, he argued that he was subjected to custodial interrogation without having been advised of his Miranda rights. Consequently, Marko contended, those statements should be suppressed.[2] The trial court found that Marko was not in custody when he was questioned by the EPCS officers in the interview room before the point at which the officers advised him of his rights. As relevant here, the trial court made the following findings: (1) it was within the military's discretion as to how to transport Marko to the PMO; (2) handcuffing Marko during transport was standard MP protocol for officer safety; (3) Marko was not restrained while in the PMO interview room; (4) an EPCS officer informed him that he was not under arrest and that he was free to leave at any time; (5) the interview room was not locked and neither of the EPCS officers blocked Marko's access to the door; and (6) he was free to leave the room if he chose to do so.
¶34 The court of appeals affirmed the trial court's conclusion. In so doing, the division held that, although the influence of military authority plays a role in the custody inquiry, and Marko was subject to restraint on his freedom of movement by virtue of his position in the military, the influence of military authority was but one factor to consider. Under the totality of the circumstances, the division determined that Marko was not in custody. We agree.
1. Marko Was Not in Custody When Interviewed by EPCS Officers Before He Was Advised of His Rights
¶35 The so-called Miranda rule protects a defendant's Fifth Amendment right against self-incrimination by prohibiting the introduction of statements procured by custodial interrogation unless the police officers have first given an advisement of the defendant's rights. Miranda , 384 U.S. at 444, 86 S.Ct. 1602 ; People v. Matheny , 46 P.3d 453, 462 (Colo. 2002). Miranda protections apply only if a defendant is subject to interrogation while in custody. Mumford v. People , 2012 CO 2, ¶ 12, 270 P.3d 953, 956. The only issue here is whether Marko was in custody when he made the statements he seeks to suppress.
¶36 When making this determination, courts consider whether, under the totality of the circumstances, a reasonable person in the defendant's position would have considered himself to be deprived of his freedom of action to "the degree associated with a formal arrest" at the time of questioning. Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (internal quotation marks and citation omitted). In other words, would a reasonable person in Marko's position feel that he was not at liberty to terminate the interview and leave?
¶37 In this inquiry, a court considers, but is not limited to, such factors as the time, place, and purpose of the interrogation; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and demeanor;
*616 the length and mood of the interrogation; whether restraints or limitations were placed on the defendant's movement during interrogation; the officer's responses to any of the defendant's questions; whether the defendant was given directions during the interrogation; and the defendant's verbal or nonverbal responses to these directions. Matheny , 46 P.3d at 465-66 ; see People v. Elmarr , 181 P.3d 1157, 1162 (Colo. 2008).
¶38 A trial court's determination of whether a suspect was in custody at the time of interrogation is a mixed question of law and fact. Matheny , 46 P.3d at 462. While we defer to the trial court's findings of historical fact if they are supported by competent evidence in the record, id. , we review de novo the legal question of whether those facts establish that the defendant was in custody for Miranda purposes. Elmarr , 181 P.3d at 1161.
¶39 In his suppression hearing and on appeal, Marko argues that he was in custody from the start of the EPCS interview at the PMO. In support, he states that the MPs confronted him at his barracks and interrogated him about a missing person, used a hands-on procedure to escort him to the patrol car, warned him not to run, handcuffed him, placed him behind a screen in the back of a locked patrol car, and informed him that they were transporting him to the PMO for questioning by civilian police. Under these circumstances, Marko alleges a reasonable person in the military would regard himself as being ordered to submit to the EPCS officers' questioning. But our focus is not on whether Marko was in custody prior to his interview with the EPCS officers. Rather, the "crucial consideration [under Miranda ] is the degree of coercive restraint to which a reasonable citizen believes he is subject at the time of questioning ." People v. Breidenbach , 875 P.2d 879, 887 (Colo. 1994) (internal quotation marks and citation omitted).
¶40 When examining the totality of the circumstances relevant to the time of his interview with the EPCS officers, we conclude that Marko was not in their custody before being advised of his Miranda rights and questioned further. First, an EPCS officer explicitly told Marko at the outset of the interview that he was not under arrest and was free to leave at any time. While not dispositive of the custody determination, the officer's statement does strongly support the conclusion that a reasonable person would not have considered himself in custody at that point. See Elmarr , 181 P.3d at 1163 (noting that it was significant to the court's custodial interrogation finding that the defendant was "never told he was not under arrest, or that he was free to leave"); Matheny , 46 P.3d at 467 (holding that the defendant was not in custody when, among other factors, he was told he was not under arrest and was free to go at any time).
¶41 Additionally, the EPCS officers did not restrain Marko in any way during the interview. Although Marko was taken to the PMO in handcuffs, this restraint was pursuant to standard base protocol imposed exclusively by the MPs. The handcuffs were also removed prior to the EPCS interview. The EPCS officers did not block Marko's exit from the interview room in any way, and the room itself remained unlocked during the duration of his initial questioning. See Matheny , 46 P.3d at 468 (holding that an interview occurring in a secure police station, in itself, does not establish custody).
¶42 Finally, nothing in the record suggests that the tone of the forty-minute interview was so confrontational as to convert it from a conversation to a custodial interrogation. The EPCS officers did confront Marko with inconsistent details in his statements and tell him that they expected him to tell the truth. But these statements do not appear to have been made in an aggressive or accusatory manner.
¶43 Marko contends that all of these circumstances must give way to the facts that he was a member of the military, the MPs's conduct implied that he must come to the PMO for an interview with the civilian police, and he was transported to the PMO in handcuffs. He argues that a reasonable soldier in his position would have understood that, because of the chain of military command, he was not free to terminate the interview and leave the PMO because doing so would have *617 been construed by the MPs as disobeying a military order.
¶44 While we recognize that the military command structure and its inherent pressures should be considered when making a custody determination, it is just one factor, of many, that we assess. There is nothing in the record indicating that Marko was under an express order to speak with the EPCS officers or that he would have been subject to discipline if he had refused to participate in the interview or elected to terminate the interview pre-advisement. Instead, Marko was only under an order to report with the MPs to the PMO, where he would be met by civilian police. Marko was transported to the PMO in handcuffs as part of standard base practice (not due to any request of the EPCS officers) and he was told as much by the MPs. The handcuffs were removed before the EPCS interview, and the MPs did not participate in the interview or even remain in the room when it commenced.
¶45 On balance, we conclude that a reasonable person in Marko's position would not have felt that his freedom of action was curtailed to a degree associated with a formal arrest; therefore, we determine that Marko was not in custody during the pre- Miranda portion of his interview with the EPCS officers.
III. Conclusion
¶46 For these reasons, we conclude that the trial court did not err in denying Marko's challenge for cause to Juror C or in declining to suppress statements Marko made during the pre-advisement portion of his interview with the EPCS officers. Accordingly, we affirm the judgment of the court of appeals.

We granted certiorari to review the following issues:
1. Whether the court of appeals erred in concluding that, pursuant to People v. Novotny , 2014 CO 18, 320 P.3d 1194, the trial court's denial of Petitioner's challenge for cause of a prospective juror who could not fairly apply the law with respect to the insanity defense was not subject to reversal.
2. Whether a defendant who is in the military is in custody prior to being advised of his Miranda rights when ordered by a superior officer to attend an interrogation conducted by civilian police officers at a military police station.

Marko also argues at some length in his briefs that the statements he made after the advisement should have been excluded. That argument is outside the scope of the question on which we granted certiorari. For that reason, we do not discuss it in any detail here.