The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Bobbie Jean POLANDER and Robert
Eden Andrew, Defendants–
Appellees.

No. 01SA79.

Supreme Court of Colorado,
En Banc.

Oct. 1, 2001.

**700**

Robert S. Grant, District Attorney, 17th Judicial District Michael J. Milne, Senior Deputy District Attorney, Brighton, CO, Attorneys for Plaintiff–Appellant.

Natalie Frie, Englewood, CO, Attorney for Defendant–Appellee Robert Eden Andrew.

David S. Kaplan, Colorado State Public Defender J. Brandeis Sperandeo, Deputy State Public Defender Brighton, CO, Attorneys for Defendant–Appellee Bobbie Jean Polander.

Justice COATS delivered the Opinion of the Court.

The People appealed pursuant to section 16–12–102(2), 6 C.R.S. (2000), and C.A.R. 4.1, challenging the trial court's suppression of drugs discovered on Defendant Andrew's person and in his van, as well as statements made by Defendant Polander at the scene of the arrest and later at the police station. The district court suppressed Defendant Polander's initial statement as the product of custodial interrogation without a valid waiver of *Miranda* rights, and it suppressed all of the evidence seized from Defendant Andrew and his van, as well as Defendant Polander's subsequent statement, as the fruit of an illegal seizure of the defendants. Because the investigatory stop of the defendants was justified by reasonable articulable suspicion, the district court's suppression of evidence as the fruit of an illegal seizure is reversed. However, since Defendant Polander was in custody within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), without the benefit of *Miranda* warnings, when she initially admitted ownership of the drugs found in the vehicle, the trial court's order suppressing that statement is affirmed, and the case is remanded for further proceedings.

## I.

Following a report of suspected drug activity in the parking lot of a Burger King restaurant and the subsequent discovery of suspected narcotics on Defendant Andrew's person and in his van, the defendants were arrested and charged with unlawful possession with the intent to distribute twenty-five to four hundred fifty grams of a schedule II controlled substance. Each filed a number of pretrial motions, including motions to suppress both evidence seized and statements made following their stop and arrest by the Thornton police. The only witnesses to testify at the joint suppression hearing were Officers Longobricco and Frazen, who responded to the scene and arrested the defendants, and Officer Chavez, who filed the case.

According to the uncontradicted testimony of the officers, the Thornton police received a call at 10:48 p.m., on June 4, 2000, from an unnamed Burger King employee reporting that a white, service-type van and a small white vehicle had been parked in the southwest area of the Burger King parking lot at 301 84th Avenue for about 30 minutes, and that an employee had observed the occupants passing a marijuana pipe back and forth. Within minutes both Officers Longobricco and Frazen were dispatched to the parking lot to investigate a possible narcotics violation involving a white service truck. When they arrived minutes later, they found that the only two vehicles on the west side of the lot were a white service van and a smaller vehicle parked within inches of the van's passenger side.

Both officers parked their cars behind the service van and approached it from opposite sides. Looking through the rolled-down, driver's side window, Officer Longobricco could see that no one was occupying the driver's seat, but several people were communicating and engaging in some activity in the back of the van. After getting no response to his first inquiry concerning the driver of the van, Officer Longobricco inquired a second time. Defendant Andrew then turned toward him and answered that he was the driver.

Because Andrew's hands were in his pockets when he turned to answer, and because the back of the van visibly contained various tools that could be used as weapons, Officer Longobricco asked him and the other occupants to step outside in order to pat them down for weapons. Longobricco felt a small, hard object in Andrew's right front pocket. When asked, Andrew indicated that he did not know what the object was but gave permission to Officer Longobricco to remove the object and subsequently to look inside it. After discovering that the small, cylindrical container held what appeared to be a narcotic, Officer Longobricco handcuffed Andrew and instructed him to sit on a nearby curb.

While Longobricco was questioning Andrew, Officer Frazen had Defendant Polander and the other two occupants come out of the van, and he patted them down for weapons. They were similarly instructed to sit on the curb next to Andrew, although they were not handcuffed. Having found what looked like narcotics, the officers asked and were granted permission to search the van, by Andrew. Officer Frazen found a spoon that appeared to have been burned, a razor blade, a black purse belonging to Polander, and a purple "Crown Royal" bag in the van. Both the purse and Crown Royal bag contained white, powdery balls suspected of being cocaine. When Longobricco asked to whom the Crown Royal bag belonged, Polander responded that it was hers. Polander was then handcuffed, placed in Officer Frazen's patrol car, and taken to the Thornton police station, where she was advised both orally and by written form of her *Miranda* rights. After waiving her *Miranda* rights, Polander gave oral and written statements indicating that the cocaine was hers and that her intent was to sell it.

At the conclusion of the testimony, the trial court made findings of fact and announced its conclusions of law. The court found that neither the report nor the observations of the officers when they arrived on the scene gave them reasonable suspicion to conduct an investigatory stop, and therefore it suppressed the evidence found on Defendant Andrew. It also found that Defendant Polander was in custody when she initially admitted ownership of the drugs from the van, and it similarly suppressed that statement. It did not, however, order suppression of the evidence taken from the van, finding that Defendant Andrew gave voluntary consent to search. Nor did it suppress Defendant Polander's subsequent statement at the police station, finding that it followed a valid waiver of her *Miranda* rights and that her earlier statement, although taken in violation of *Miranda*, was nevertheless voluntary.

Several weeks later, the trial court heard additional argument and reconsidered its initial ruling. In its subsequent written ruling it decided that despite the voluntariness of Defendant Andrew's consent to search his van, that consent was the fruit of the initial illegal stop and subsequent search of his person. Similarly, the trial court held that although Defendant Polander's post-*Miranda* statement was not inadmissible be-

cause of her earlier, pre-*Miranda* statement to the same effect, it was directly connected to the initial illegal activity, without attenuation or independent source. The court therefore modified its suppression order to include the evidence seized from the van and Defendant Polander's post-*Miranda* statement.

The People filed their interlocutory appeal pursuant to section 16–12–102(2) and C.A.R. 4.1 from the trial court's suppression order as modified.

## II.

■ The Fourth Amendment's protection against unreasonable searches and seizures includes the seizure of a person and prohibits an arrest in the absence of probable cause to believe the person being arrested has committed a crime. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Probable cause is determined by consideration of the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The probable cause standard is a "practical, nontechnical conception," involving common-sense conclusions about human behavior. *Id.* It is a "fluid concept," turning on the assessment of probabilities in particular factual contexts that are not reducible to a neat set of legal rules. *Id.* at 232, 103 S.Ct. 2317. As such, probable cause depends upon both the content of the information possessed by the police and its degree of reliability. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

■ Although the probable cause determination may include consideration of information provided to the police by other people, the value of this kind of information to the ultimate determination of probable cause obviously requires some assessment of its reliability. Both the truthfulness of the person providing the information and the way in which he acquired the information have long been considered important factors in this assessment. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). If he did not actually see or otherwise perceive firsthand the facts that he asserts, it is nevertheless important to be able to tell that he acquired the information in a way that pro-

vides a good reason to believe it is accurate. *Id.* Similarly, even if the inherent credibility of the informant cannot be determined from past experience or in some other way, it would be meaningful if there were some reason to credit the reliability of his information on the particular occasion at issue. *Id.* While the two prongs of the so-called *Aguilar–Spinelli* test, with their joint concerns for "veracity," "reliability," and "basis of knowledge" were, and continue to be, highly relevant to the value of information provided to the police, it is also now well-established that "the two prongs were intended simply as guides," and that each "prong" need not be satisfied in any technical sense in order for the information to be included in the evaluation of probable cause. *Gates,* 462 U.S. at 230–32, 103 S.Ct. 2317; *People v. Pannebaker,* 714 P.2d 904, 907 (Colo.1986).

■ Rather than being accorded independent status, these two elements are better understood as relevant considerations in the totality-of-circumstances analysis: a deficiency in one may be compensated for by a strong showing as to the other, or for that matter, by some other indicia of the information's reliability altogether. *See Gates,* 462 U.S. at 233, 103 S.Ct. 2317. If, for example, an unquestionably honest citizen comes forward with a report of criminal activity, which if fabricated might subject him to criminal liability, rigorous scrutiny of the basis for his knowledge may not be necessary. *See, e.g., Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (used as an example in *Gates,* 462 U.S. at 234, 103 S.Ct. 2317). Conversely, even if enough information were not known to fully credit an informant as being a "citizen-informant," whose veracity would automatically be accepted, *see People v. Edmonds,* 195 Colo. 358, 364, 578 P.2d 655, 661 (1978) (finding disclosure of identity and place of employment sufficient to satisfy "first prong" of *Aguilar–Spinelli* test), a detailed description of the alleged wrongdoing, along with a statement that the event was observed firsthand, would entitle the information to more reliability than might otherwise be the case. *See Gates,* 462 U.S. at 234, 103 S.Ct. 2317. The totality-of-circumstances test permits a balanced assessment of the relative weights of all the

various indicia of reliability (and unreliability) attending information provided by someone other than the police, in conjunction with the information already known to or learned by the police, *id.*, and requires merely that there be a "fair probability" that the defendant committed a crime. *Id.* at 238, 103 S.Ct. 2317.

■■■■■ An investigatory stop—a form of personal seizure that is less intrusive than an arrest—is also considered reasonable within the meaning of the Fourth Amendment if it is supported by "some minimal level of objective justification," designated "reasonable articulable suspicion." *Alabama v. White,* 496 U.S. at 330, 110 S.Ct. 2412 (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence and is less demanding even than the "fair probability" standard for probable cause. *Id.* at 330, 110 S.Ct. 2412. Reasonable suspicion is a less demanding standard, however, not only in the sense that it can be established with information that is different in quantity or content from that required for probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Id.*

■■■■■ As with probable cause, the totality-of-circumstances test of *Illinois v. Gates* has replaced the "two-pronged" test of *Aguilar–Spinelli* in evaluating reasonable articulable suspicion, and takes into account both the quality and quantity of information known to the police. *White,* 496 U.S. at 329–30, 110 S.Ct. 2412. An investigatory stop, based in part on information provided by someone other than the police, is therefore justified as long as the totality of the circumstances indicates that the police possess some minimal level of objective suspicion (as distinguished from a mere hunch or intuition) that the person to be stopped is committing, has committed, or is about to commit a crime. *Id.; Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Without more, even a truly anonymous tip—one providing no basis for assessing the informant's basis of knowledge or veracity in any way— can amount to reasonable articulable suspicion for a stop if it contains, and the police

corroborate, not easily obtained, predictive detail. *See Florida v. J.L.,* 529 U.S. 266, 269, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *White,* 496 U.S. at 332, 110 S.Ct. 2412; *Gates,* 462 U.S. at 245, 103 S.Ct. 2317.

■■■■■ Although the trial court referred to the report in this case as an "anonymous" report because the caller was unnamed in the dispatch log, the report was far from the type of "anonymous tip" addressed by the Supreme Court in *Gates, White,* or *J.L.* Rather than providing no information from which the *Aguilar–Spinelli* concerns could be assessed, it provided considerable information about both prongs. According to Detective Chavez, the dispatch log indicated that the white service van had been in the Burger King parking lot for about a half-hour and that a Burger King employee observed the occupants of the vehicle passing a marijuana pipe back and forth. With regard to the second prong, Chavez testified that the dispatch log also indicated the caller was an employee of the Burger King restaurant. The trial court found that these were the first-hand observations of the caller, but nevertheless treated the report as having the value of an anonymous report, which it considered insufficiently corroborated by independent police observations.

It has long been recognized that assessing the veracity of average citizens who may be victims or witnesses reporting crime does not pose the same problem as assessing the veracity of informants from the criminal milieu. *See, e.g., Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)(Harlan, J., dissenting: "[T]he ordinary citizen who has never before reported a crime to the police may, in fact, be more reliable than one who supplies information on a regular basis."); *see generally* 2 Wayne R. LaFave, *Search and Seizure* § 3.4 (3d ed.1996). While the precise requirements for qualification as a "citizen informant," who would automatically satisfy the "veracity" prong of the *Aguilar–Spinelli* test, were not clearly established before the broadening of the test in *Gates,* it was at least accepted that someone who identified himself made it possible to determine

whether he had an ulterior motive for reporting, and thereby placed himself at some risk of reprisal or of jeopardy for false reporting. Since the two prongs of the *Aguilar–Spinelli* test have been subsumed within the totality-of-circumstances test, it has been noted that placing one's anonymity at risk is a factor to be considered in weighing reliability. *See Florida v. J.L.,* 529 U.S. at 275, 120 S.Ct. 1375 (Kennedy, J., concurring); *see also United States v. Sierra–Hernandez,* 581 F.2d 760 (9th Cir.1978).

Whether or not the caller's identification of himself as an employee of the restaurant in whose parking lot the criminal conduct was taking place would be enough to categorize him a "citizen-informant," it was an important factor not taken into account by the trial court. The information reported by the caller did not purport to be inside or predictive information. It simply claimed to be the firsthand, contemporaneous observation of ongoing criminal activity outside the caller's location. Perhaps most importantly, because the police did not respond with a show of force or immediately arrest the defendants, the information provided by the caller, in conjunction with the corroboration and other observations of the police themselves, need only have amounted to the minimal level of objective justification necessary for an investigatory stop.

■ Although the officers parked behind the van, apparently limiting its ability to leave, nothing in the record suggested an awareness of this by the defendants. In fact, nothing in the record suggested that a reasonable person in the position of the defendants would have felt that he was not free to leave or refuse to comply with demands of the police, until the occupants were removed from the van to be frisked for weapons. *See INS v. Delgado,* 466 U.S. at 216, 104 S.Ct. 1758 (questioning is not detention unless circumstances of encounter are so intimidating that a reasonable person would have believed he was not free to leave if he had not responded); *see also People v. Cascio,* 932 P.2d 1381, 1386 (Colo.1997)(citing *Delgado* test in reference to an approach to a parked car). By that point, the officers had corroborated that there really was a white service van parked in the southwest lot of the Burger King restaurant at 301 84th Avenue, at al-most 11:00 at night, and that another vehicle was parked within inches of the van's passenger side. They also knew that no one was sitting in the driver's seat but that several people were involved in some activity in the back of the van, and that Defendant Andrew was slow to face them or respond to their inquiry about ownership of the van.

■ Unlike the truly anonymous tips in *Alabama v. White* and *Florida v. J.L.,* where the corroboration of predictive information was considered important as a means to test the informant's knowledge or credibility, about which nothing could be known, *see J.L.,* 529 U.S. at 271, 120 S.Ct. 1375; *White,* 496 U.S. at 332, 110 S.Ct. 2412; *see also People v. Salazar,* 964 P.2d 502, 505 (Colo. 1998); *People v. George,* 914 P.2d 367, 369 (Colo.1996); *People v. Garcia,* 789 P.2d 190, 192 (Colo.1990), the caller in this case provided significant information about both his or her veracity and basis of knowledge. And the personal observations of the police, cursory as they may have been, not only corroborated portions of the caller's information but aroused suspicions in themselves. In conjunction with the (at least) somewhat reliable report, their partial corroborations, and their own observations of suspicious conduct, the police had a reasonable articulable suspicion of criminal conduct justifying a stop of the defendants by the time a stop actually occurred, and in light of the darkness, numerous visible tools, and hands in pockets, they also had reasonable grounds for a weapons frisk.

Those orders of the trial court suppressing evidence and statements as the fruit of an illegal investigatory stop were, therefore, erroneous. Because the investigatory stop of Defendant Andrew was not illegal, neither the substances seized from the person of Defendant Andrew, nor the voluntary consent for a search of his van could have been the product of an illegal detention. For the same reason, Defendant Polander's second statement, made at the police department, admitting her ownership of the drugs and intent to sell them, could not have been the product of an illegal investigatory stop or illegal seizure of the drugs.

## III.

The People also challenge that portion of the trial court's order suppressing Defendant Polander's initial, curbside statement as the product of custodial interrogation without a valid waiver of *Miranda* rights. An interrogation is custodial within the meaning of the phrase "custodial interrogation" if it occurs while the person making the statement is "in custody at the station or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. "[T]he safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)(relying on language from *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), itself an interpretation of the holding of *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Under *Berkemer*, the question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest. 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.6(c), at 526 (2d ed.1999). As this court has previously made clear, *Miranda* rights are, therefore, implicated when police detain a suspect using a degree of force more traditionally associated with concepts of "custody" and "arrest" than with a brief investigatory detention. *People v. Breidenbach*, 875 P.2d 879, 887 (Colo.1994).

At the time she initially admitted ownership of the drugs from the van, Defendant Polander was not confined at the police station, nor did the police draw their guns, use handcuffs, or otherwise demonstrate the kind of force typically associated with an arrest, as distinguished from an investigatory stop. *See Breidenbach*, 875 P.2d at 886. Defendant Polander was, however, seized and subjected to a question about the ownership of contraband, under circumstances in which it was apparent to all that the police had grounds to arrest the occupants of the vehicle. Whether or not the police had announced that her seizure was elevated in their minds from an investigatory stop to an arrest, it is clear that the defendant had every reason to believe she would not be briefly detained and then released as in the case of an investigatory stop or a stop for a minor offense. Under these circumstances the defendant's freedom of action was curtailed to a degree associated with formal arrest.

## IV.

In sum, because the trial court erred in determining that the initial stop of the defendants was not supported by reasonable articulable suspicion, those portions of its order suppressing evidence and statements as the product of an illegal stop, or the seizure of evidence that was itself the product of an illegal stop, are reversed. The trial court's suppression of defendant Poland's initial statement, made before she was warned of *Miranda* rights, is affirmed. The case is remanded for further proceedings consistent with the opinion of this court.