The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Terry HANKINS, Defendant–Appellee.

No. 08SA343.

Supreme Court of Colorado,
En Banc.

Feb. 23, 2009.

Bonnie S. Roesink, District Attorney, 14th Judicial District, Carl E. Stahl, Chief Deputy, Jeremy J. Snow, Deputy District Attorney, Craig, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Colorado State Public Defender, Sheryl Uhlmann, Deputy State Public Defender, Steamboat Springs, Colorado, Attorneys for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

The prosecution brought this interlocutory appeal pursuant to C.A.R. 4.1 to challenge the trial court's suppression of several murder confessions and other related statements by the defendant Terry Hankins.[1] Hankins initially confessed to police without first being advised of his *Miranda* rights. Soon after his initial confession, police advised Hankins of his *Miranda* rights, which he waived before giving his next three statements. Ruling that Hankins was in custody when he made his initial confession, the trial court granted his motion to suppress. The trial court also suppressed his subsequent statements, concluding that the later *Miranda* warnings did not cure the initial *Miranda* violation because "there was insufficient attenuation between the violation and subsequent waivers."

We reverse the suppression order. We hold that Hankins was not in custody when he made the initial confession and he was properly Mirandized before his subsequent custodial statements.

## I.

On August 24, 2007, seventy-year-old Hankins sat staring out from a police car window at a mound of soil on the far edge of his mining claim near Craig, Colorado, where he had voluntarily led two investigators whom he had invited to his home that morning. He pointed and said, "She's under that pile of dirt." Hankins was referring to his wife Cynthia, who had disappeared several months earlier.

Shortly after Hankins revealed the location of his wife's body, one of the investigators

Public Defender, Steamboat Springs, Colorado, Attorneys for Defendant–Appellee.

---

1. The issues presented by the prosecution on review are:

 (1) Did the trial court err in its application of the law to the facts when it determined that Hankins was in custody so as to require a *Miranda* advisement when he made his first confession to Investigator DeAngelo at the burial mound, resulting in the suppression of that confession on *Miranda* grounds?

 (2) Did the trial court err in ruling that voluntary statements made by Hankins after valid advisement and waiver of his *Miranda* rights were tainted by earlier voluntary un-Mirandized statements so as to require suppression of the later Mirandized statements?

asked, "Terry, tell us while we're here right now, what happened that night?" Hankins then described how he had murdered his wife Cynthia by strangling her, hitting her over the head with a crowbar, and then meticulously carving her body into quarters in their bathtub, "like butchering a deer," he said, so he could more easily transport her remains. He then buried her body parts and all her belongings under the pile of dirt. Thinking that no court of law would believe his claim of self defense, Hankins vacated their apartment and told friends that his wife had run off with another man.

Hankins made this statement in the investigator's car at the burial site and on the drive back to his home. The investigators treated him politely and maintained an inquisitive, respectful tone. Several times during and after the approximately fifteen-minute confession, investigators told Hankins, "You're free to go at any time . . . you don't have to tell us any more . . . you're still free to go."

On arriving at Hankins' home, the investigators advised Hankins of his *Miranda* rights, which he waived. Inside, the investigators asked Hankins to again describe "from A to Z" what happened. Now Mirandized, Hankins walked through the details of the events leading up to the murder, the murder itself, and what happened since.

The investigators then transported Hankins to police headquarters where they again read him his *Miranda* rights. He signed a waiver and then gave his third confession of the day, this time captured on video inside a police interrogation room. The following day, Hankins gave additional statements, once again preceded by a full advisement of his *Miranda* rights, which he again waived.

In the months leading up to his initial murder confession, Hankins and the local police grew familiar with each other. The police spoke with Hankins several times, served search warrants on his home, and confiscated some of his property over the course of the summer of 2007. Throughout these events, Hankins maintained he was not involved in his wife's disappearance, and the police did not arrest Hankins. Before his initial confession, investigators did have evidence linking Hankins to check forgeries and illegal narcotics.

On the day Hankins confessed to the murder, Investigators Joe DeAngelo and Jen Kenney arrived at Hankins' home, where they spent about an hour discussing Hankins' involvement in fraud and drugs. The investigators then turned the discussion towards Cynthia's disappearance. The investigators DeAngelo and Kenney emphasized they were only seeking the truth and stated that Cynthia's children deserved to have their mother buried properly. In response, Hankins agreed to show them where he had hidden Cynthia's body. Investigators commended him for allowing Cynthia to now have a "good Christian burial."

Hankins initially offered to drive the investigators to the burial site in his van. When the investigators opted to drive in a police vehicle, Hankins drove with them providing directions and carrying on a conversation in a relaxed tone. At times, Hankins and the investigators joked about matters unrelated to the case.

Following the identification of the burial site and Hankins' confessions, the Moffatt County District Attorney filed nine charges against Hankins: first degree murder; abuse of a corpse; three counts of theft; three counts of forgery; and one count of possession of oxycodone.

The trial court found that all the statements Hankins made to police "were voluntary without exception, and that includes the statements he made after he was in custody." The court also found police did not coerce Hankins to produce his statements. The court, however, decided Hankins was in custody for *Miranda* purposes as soon as he showed investigators where he buried Cynthia. At this juncture, the trial court found that Hankins had "implicated himself in the death of his wife in a way that would likely result in criminal charges against him, even if nothing else was known at that point." The trial court concluded "no reasonable person in his shoes would believe that they were free to go at that stage."

The trial court found Investigator DeAngelo's question at the burial site that spurred

Hankins' initial confession "was a question designed to elicit an incriminating response. Therefore, it should have been preceded by a *Miranda* warning." The court suppressed Hankins' statements made in response to that question.

The court also suppressed all later statements Hankins made to police that day and the next, despite proper *Miranda* advisements and Hankins' waivers, because "there was insufficient attenuation between the violation and subsequent waivers."

The prosecution's interlocutory appeal followed.

## II.

We reverse the suppression order. We hold Hankins was not in custody when he made his initial confession and that he was properly Mirandized before his subsequent custodial statements.

### A. Standard of Review

When a trial court rules on a motion to suppress a confession, it engages in both fact-finding and law application. *People v. Kaiser*, 32 P.3d 480, 483 (Colo.2001). We defer to the trial court's findings of fact if supported by the record. *People v. Elmarr*, 181 P.3d 1157, 1161 (Colo.2008); *People v. Matheny*, 46 P.3d 453, 462 (Colo.2002). We review de novo the legal question of whether those facts establish that the suspect was in custody when interrogated. *Elmarr*, 181 P.3d at 1161. A trial court may not reach legal conclusions that are not supported by the record. *People v. Minjarez*, 81 P.3d 348, 355 (Colo.2003).

### B. Custodial Interrogation

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. *Miranda v. Arizona* protects this right by requiring the prosecution to establish that the police gave proper warnings before the suspect made a statement during custodial interrogation. 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966);

*People v. Breidenbach*, 875 P.2d 879, 885 (Colo.1994).

A trial court must suppress any statement made during a custodial interrogation not preceded by a proper *Miranda* warning. *People v. Wood*, 135 P.3d 744, 749 (Colo.2006). This does not mean that police officers are "required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because ... the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). A *Miranda* warning must be given when "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Id.*

Whether a person is in custody for *Miranda* purposes involves an objective test requiring the court to determine "whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny*, 46 P.3d at 467 (quoting *People v. Taylor*, 41 P.3d 681, 691 (Colo.2002)); *see People v. Stephenson*, 159 P.3d 617, 620 (Colo.2007) ("The touchstone of custody is significant curtailment of the defendant's freedom of action that is equivalent to a formal arrest."); *see also Thompson v. Keohane*, 516 U.S. 99, 113–14, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). To determine whether the defendant had such a reasonable belief, a court must consider the totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Matheny*, 46 P.3d at 460. Factors to consider include:

(1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether di-

rections were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo.1997)); *People v. Dracon*, 884 P.2d 712, 717 (Colo. 1994). No single factor is determinative. *Minjarez*, 81 P.3d at 353. Telling the suspect he is free to leave does not necessarily mean that no *Miranda* warning is required, especially when all the external factors point to finding the defendant in custody. *Id.* at 357; *Elmarr*, 181 P.3d at 1161.

■ The court may not consider the "unarticulated thoughts or views of the officers and suspects," because the custody test is objective in nature. *Elmarr*, 181 P.3d at 1162; *see Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

## C. Application to this Case

The prosecution contends that Hankins was not in custody when Investigator DeAngelo asked him, "Terry, tell us while we're here right now, what happened that night?" To determine whether Hankins was in custody we must engage in "[a]n objective assessment of whether a reasonable person in [Hankins'] position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny*, 46 P.3d at 467 (quoting *Taylor*, 41 P.3d at 691); *accord People v. Polander*, 41 P.3d 698, 705 (Colo.2001).

■ Applying this standard to the facts, we conclude that Hankins was not in custody when he gave his initial confession. The totality of the circumstances demonstrate that he was not deprived of his freedom of action to the degree associated with a formal arrest when he led investigators to the burial site and returned with them back to his home. The investigators encouraged Hankins to tell the truth and warned him of the consequences of lying. *Matheny*, 46 P.3d at 467 (Defendant found not in custody when

"officers were completely honest with Defendant," encouraged him to tell the truth and warned him of the consequences of lying, used a soft tone of voice, maintained a polite demeanor, and used "entirely reasonable" words. " 'There were no directions given to the Defendant,' and there was 'no restraint placed upon him.' " (Internal citations omitted)).

As in *Matheny*, where we also determined the defendant was not in custody, Hankins was unrestrained before and after he identified the location of the body. *Id.* Also like *Matheny*, the officer's words were reasonable, and the investigators' demeanor and tone remained consistently respectful, inquisitive, and un-abrasive. The investigators did not direct Hankins; rather, Hankins suggested the drive to the burial site and the investigators followed his lead. Additionally, the investigators repeatedly told Hankins while driving to and from the site that Hankins was free to go. Based on these factors, like the defendant in *Matheny*, Hankins was not in custody at the time he gave his initial confession. *See id.* (finding the defendant "was not in custody when the interview began and, although long, nothing occurred during the interview—up until the time of the arrest—that would convert a noncustodial situation into a custodial one").

■ The trial court agreed with Hankins' argument that the act of identifying the body created a situation where an objectively reasonable person would anticipate and fear being arrested. This belief, the trial court found, was enough to place Hankins in custody at the time he identified the body and before he gave his initial confession. Therefore, the trial court concluded, Hankins should have been advised of his *Miranda* rights before this confession. However, expectation, apprehension, or knowledge of inevitable arrest are not the *Miranda* triggers; custody is. Here, although the interrogation was in progress, the surrounding factual circumstances fall short of demonstrating restraint equivalent to arrest.

Hankins chose to accompany the police to and from the burial site. The police treated him in a manner consistent with someone not

in custody. *See, e.g., Matheny,* 46 P.3d at 467–68 (noting that although police intended to elicit a confession from defendant, "persuasion is not coercion, and the atmosphere and tone of the interview certainly did not evince any attempt by the police to 'subjugate the individual to the will of his examiner' ") (quoting in part *Miranda,* 384 U.S. at 457, 86 S.Ct. 1602). The trial court found that all of Hankins' statements were voluntary, including the initial confession, and were not "the product of any coercion on the part of any law enforcement officers."

Hankins nevertheless analogizes his circumstances to one of the defendants in *Polander* who was:

> seized and subjected to a question about the ownership of contraband, under circumstances in which it was apparent to all that the police had grounds to arrest the occupants of the vehicle. Whether or not the police had announced that her seizure was elevated in their minds from an investigatory stop to an arrest, it is clear that the defendant had every reason to believe she would not be briefly detained and then released as in the case of an investigatory stop or a stop for a minor offense. Under these circumstances the defendant's freedom of action was curtailed to a degree associated with formal arrest.

41 P.3d at 705.

*Polander* is distinguishable from this case. In *Polander,* the police caught Polander and her friends using drugs in the back of a van, searched each of them as part of an investigatory stop, ordered them to sit on the curb, and handcuffed a member of the group before Polander made any incriminating statements to police. *Id.* at 701. In short, the police had seized Polander at the time she made the statements that resulted in suppression. *Id.* at 705.

 The police had not seized Hankins when he gave his initial confession. He invited the police to his home to talk and voluntarily led them to and back from the burial site. He was not the subject of an investigatory stop or any other type of detention whereby law enforcement officers exercised power over him. A consensual interview that takes place at the defendant's request, on his property and at a place where he offered to drive the investigators does not exert the compulsive forces *Miranda* sought to prevent. *Berkemer,* 468 U.S. at 437, 104 S.Ct. 3138 (reiterating that *Miranda* applies only to those situations exerting "upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"); *see Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *see also Matheny,* 46 P.3d at 468 (noting that "a consensual interview between a defendant and the police, that takes place in the presence of the defendant's mother, does not exert the compulsive forces *Miranda* sought to prevent").

 The trial court's conclusion that Hankins' initial confession was voluntary, coupled with facts demonstrating that this statement occurred under non-custodial circumstances, renders his initial confession admissible despite the lack of a *Miranda* warning. *People v. Platt,* 81 P.3d 1060, 1066 (Colo.2004) ("Statements and confessions received as a result of a non-custodial interrogation are admissible, if they are voluntary."). Contrary to the trial court's conclusion, none of Hankins' statements at issue in this appeal should have been suppressed.

### III.

Accordingly, we reverse the trial court's suppression order and remand this case for further proceedings consistent with this opinion.