2012 CO 2

**Andrew Wayne MUMFORD, Petitioner**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

No. 10SC295.

Supreme Court of Colorado,
En Banc.

Jan. 17, 2012.

Rehearing Denied Feb. 27, 2012.

Douglas K. Wilson, State Public Defender, Office of the State Public Defender, Ryann S. Hardman, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Office of the Attorney General, Melissa D. Allen, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In March 2008, a jury convicted Andrew Wayne Mumford of possession of one gram or less of cocaine, in violation of section 18–18–405(1), C.R.S. (2007). The trial court sentenced Mumford to two years of supervised probation. On appeal, Mumford challenged his conviction on several grounds, arguing, among other things, that the trial court should have suppressed his statements to a law enforcement officer because they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A split division of the court of appeals affirmed Mumford's judgment of conviction. *People v. Mumford,* — P.3d ——, 2010 WL 961644 (Colo.App.2010). We granted Mumford's petition for a writ of certiorari, limiting our review to whether the court of appeals erred in determining that Mumford was not in custody for purposes of *Miranda* when he made an incriminating statement to a detective. We now affirm.

### I.

¶ 2 Witnesses at Mumford's suppression hearing testified to the following facts. On June 20, 2007, approximately six to nine law enforcement officers arrived at Mumford's residence in Colorado Springs to execute warrants to search the home and to arrest Mumford's friend, Christopher Timmerman, who had allegedly sold drugs from the residence. Mumford was at his home with Denise Hartman (Mumford's girlfriend), Timmerman, a friend named Huery, and a friend of Huery's, named Matt. Mumford testified that when the police arrived to execute the warrants, they showed him a picture of Timmerman and asked if Timmerman was there. In

response, Mumford retrieved Timmerman and presented him to the police officers. One or more police officers had their guns drawn at the outset of this encounter.

¶ 3 Police arrested Timmerman. Timmerman told police that he had marijuana in his pocket and a quarter pound of marijuana in the house. Hartman told police that she had needles and a small amount of methamphetamine in her purse inside Mumford's residence. Police officers recovered the drugs. Officers also observed Huery inside the house holding a marijuana pipe.

¶ 4 Police officers handcuffed Timmerman, Hartman, and Huery. Mumford testified that Huery's friend Matt was told it was his "lucky day"; Mumford observed Matt leave and walk down the street. Officers patted Mumford down, took his identification, and directed him to sit on a curb outside the residence along with Timmerman, Hartman, and Huery. One or more officers stood nearby. Although Mumford testified that he was handcuffed, two officers testified to the contrary.

¶ 5 Mumford testified that as he sat on the curb with the others, an officer looked over at the group and made a statement to the effect that if they told the truth, nothing bad would happen.

¶ 6 Detective John Sarkisian approached Mumford at the curb and briefly interviewed him to find out who Mumford was and if he lived there, or what his situation was with the residence. The detective explained to Mumford that the officers had a search warrant for drugs and asked Mumford if there was anything in the house that he (the detective) needed to know about. The detective testified that he did not display his weapon, that his tone was conversational, and that Mumford did not ever indicate any unwillingness to talk to him. During his testimony, Mumford acknowledged that the detective was neither aggressive nor threatening. Mumford told the detective that he had a

small amount of cocaine for personal use in his bedroom nightstand drawer, in a tin, under some CDs. Detective Sarkisian left Mumford at the curb, entered the residence, and discovered the cocaine in the location that Mumford described. Mumford was then arrested, handcuffed, and placed in a patrol vehicle.

¶ 7 Mumford moved to suppress his statement,[1] arguing in part that he was subjected to custodial interrogation without having been given *Miranda* warnings. Following a hearing, the trial court determined that Mumford was not in custody at the time of Detective Sarkisian's interview, and denied Mumford's motion to suppress.

¶ 8 Specifically, the trial court found that although the police had a search warrant for the residence and an arrest warrant for Timmerman, they did not have any particular information with respect to Mumford and apparently did not expect him to be there. The trial court found that when officers first arrived at the house, a weapon or weapons were drawn, but only briefly, and only during the initial part of the encounter. The court found that the police removed people from the house while they conducted the search; that Mumford's identification was requested and taken from him; and that Mumford was told to go to the curb in front of the residence, where he joined at least two other occupants. The trial court observed that, according to Mumford, Huery's friend Matt was released and that Mumford saw him walk down the street. Importantly, the trial court found that although one or more officers were nearby and Mumford was told he was not free to leave, police were not guarding Mumford closely, and Mumford was not in handcuffs or otherwise physically barred or restrained at the time he was questioned by Detective Sarkisian.

¶ 9 The trial court found that some form of reassurance was given by an officer[2] to

---

1. Because the residence was searched pursuant to a lawful warrant, defense counsel acknowledged at the suppression hearing that there was no basis to seek suppression of the actual cocaine seized in the search.

2. Although Mumford's redirect testimony briefly suggested that Detective Sarkisian may also have given some sort of reassurance, his initial testimony indicated that this remark was actually made by another officer standing nearby and was directed to the whole group, not necessarily to Mumford. Detective Sarkisian did not recall giv-

Mumford, and that this reassurance ultimately persuaded Mumford to speak, but the court concluded that Mumford's "subjective analysis" of the situation was not relevant to the legal determination of custody. The trial court observed that there was no testimony indicating that Mumford was detained at the curb for a lengthy time. Finally, it found that the detective's questions were made in a conversational tone and were "relatively innocuous" (effectively, "is there anything I should know about"), and that the detective actually left the defendant at the curb at least once to go into the residence to find the drugs. Based on the totality of the circumstances, the trial court concluded that Mumford was not in custody when he gave the statement, and that no *Miranda* advisement was required.

¶ 10 A split division of the court of appeals affirmed. *Mumford,* —— P.3d at ——. The majority concluded that Mumford was not in custody at the time of the detective's questioning because he was only briefly questioned under circumstances that manifested nothing more than a temporary detention permissible under the Fourth Amendment, and that nothing elevated the encounter to a custodial situation akin to formal arrest requiring *Miranda* warnings. *Id.* at ——, ——. In reaching its conclusion, the majority observed that Mumford was not under any formal restraint; that he knew the police were focused on Timmerman, for whom they had an arrest warrant; that the brief questioning occurred outside Mumford's home, and that Detective Sarkisian asked only a few nonthreatening questions in a conversational tone. *Id.* at —— – ——. Judge Webb dissented, focusing on the officer's assurance [3] that things would go well for Mumford if he told the truth. *Id.* at —— – ——. He reasoned that the officer's assurance persuaded Mumford to make his statement with

regard to the cocaine, and that the officer's assurance, in combination with the restrictions placed on Mumford at the time of questioning, constituted a deprivation of freedom consistent with formal arrest. *Id.*

¶ 11 We granted certiorari review and now affirm.

## II.

■■■ ¶ 12 "To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings." *People v. Matheny,* 46 P.3d 453, 462 (Colo.2002) (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). Specifically, police "must advise the subject that he has the right to remain silent; that anything he says may be used against him; that he has the right to the presence of an attorney; and that if he cannot afford one, one will be appointed for him." *Id.* (citing *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). *Miranda* protections apply only where "a suspect is subject to both custody and interrogation." *Effland v. People,* 240 P.3d 868, 873 (Colo.2010). This case centers on the issue of custody.[4] Whether a defendant was "in custody" for the purposes of *Miranda* presents a mixed question of law and fact. *Matheny,* 46 P.3d at 462. We defer to the trial court's findings of historical facts, and these findings "will not be overturned if supported by competent evidence in the record." *Id.* (citing *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987)). However, "[w]hether an individual has been subjected to custodial interrogation in violation of *Miranda* is a question of law that we review de novo." *People v. Klinck,* 259 P.3d 489, 493 (Colo.2011) (citing *Matheny,* 46 P.3d at 462).

ing any such reassurance. Although the trial court found that some statement of reassurance was made, it did not expressly find that Detective Sarkisian made this statement.

3. Although Judge Webb's dissent indicates that the assurance was given by Detective Sarkisian, as noted in footnote 2 above, the trial court did not expressly find that Sarkisian (as opposed to another officer) made this statement.

4. Whether Mumford was subjected to interrogation is not formally disputed here. The People suggest in their brief that, because they did not concede that the defendant was interrogated, we may consider the issue here; however, we confine our analysis to the narrow issue of custody on which we granted certiorari review.

¶ 13 The fundamental inquiry in determining whether a suspect is in custody for purposes of *Miranda* is " 'whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest.' " *People v. Hughes,* 252 P.3d 1118, 1121 (Colo.2011) (quoting *People v. Hankins,* 201 P.3d 1215, 1218 (Colo.2009)). In making this determination, a court must consider the totality of the circumstances under which the interrogation was conducted. *People v. Howard,* 92 P.3d 445, 450 (Colo. 2004); *see also Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("[A] court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' ") (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). Some of the factors a court should consider include:

(1) the time, place, and purpose of the encounter;

(2) the persons present during the interrogation;

(3) the words spoken by the officer to the defendant;

(4) the officer's tone of voice and general demeanor;

(5) the length and mood of the interrogation;

(6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation;

(7) the officer's response to any questions asked by the defendant;

(8) whether directions were given to the defendant during the interrogation; and

(9) the defendant's verbal or nonverbal response to such directions.

*Matheny,* 46 P.3d at 465–66.

¶ 14 This list is not exhaustive, see *People v. Holt,* 233 P.3d 1194, 1197 (Colo.2010), and no single factor is determinative. *People v. Hankins,* 201 P.3d 1215, 1219 (Colo.2009) (citing *People v. Minjarez,* 81 P.3d 348, 353 (Colo.2003)).

¶ 15 The trial court's inquiry "is limited to an objective reasonable person standard." *Howard,* 92 P.3d at 451. That is, the custody assessment "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323, 114 S.Ct. 1526. Accordingly, a court may not consider the "unarticulated thoughts or views of the officers and suspects." *People v. Cowart,* 244 P.3d 1199, 1203 (Colo.2010) (quoting *Hankins,* 201 P.3d at 1219). However, where an officer's knowledge or beliefs are conveyed by word or deed to the person being questioned, such knowledge or belief may bear on the custody issue to the extent it would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his freedom of action. *Hughes,* 252 P.3d at 1122 (citing *Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526).

### III.

¶ 16 Applying these standards to the circumstances of this case, we conclude that Mumford was not in custody at the time he was questioned by Detective Sarkisian. There is no question that Mumford's temporary detention during the execution of the warrants was consistent with the Fourth Amendment. *See Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (holding that, for Fourth Amendment purposes, a search warrant founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted). Moreover, the totality of the circumstances indicates that, at the time the detective very briefly questioned Mumford, his temporary detention had not escalated to the point that an objective, reasonable person in Mumford's position would feel restrained to a degree associated with a formal arrest. Accordingly, no *Miranda* warnings were required, and the prosecution properly introduced Mumford's statement to the detective at trial.

¶ 17 "One well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen." *People v. Breidenbach*, 875 P.2d 879, 886 (Colo.1994). Here, although the police drew their guns when they first arrived at Mumford's home, they were drawn only briefly, and the detective did not display any weapon when Mumford was questioned. Thus, this case is unlike *Breidenbach*, in which an officer's continued use and display of a weapon during the questioning of a defendant transformed the investigatory stop into a custodial situation. *Breidenbach*, 875 P.2d at 886–87. The lack of physical restraint on Mumford also indicates he was not in custody. *See Cowart*, 244 P.3d at 1204 ("[T]he lack of physical restraint suggests to us that [defendant] was not in custody."). Although one or more officers were present with Mumford and his fellow occupants at the curb and Mumford was not free to leave, the trial court found that Mumford was not in handcuffs at the time he was questioned by Detective Sarkisian, nor did the officers subject him to any other sort of physical restraint, or even closely guard him.

¶ 18 In addition, from the time the officers arrived, Mumford knew from the officers' words and actions that they were focused primarily on someone else. Mumford testified that, upon their arrival, the officers presented him with a photograph of Timmerman and asked if Timmerman was present. Mumford went inside, retrieved Timmerman, and presented him to the officers. He acknowledged that, as far as he knew, Timmerman was the only person the police were trying to locate.

¶ 19 Detective Sarkisian questioned Mumford in a neutral area, on a curb directly in front of his home. *Cf. id.* (considering neutral location of questioning, defendant's home, an indicator that defendant was not in custody for purposes of *Miranda*). Mumford acknowledged at the suppression hearing that the detective was not aggressive or threatening. The detective asked Mumford a brief series of questions in a conversational tone. *Cf. id.* at 1205 (reasoning that defendant was not in custody based in part on fact that marshal conducted the interview in a "conversational tone"). The detective's open-ended questions (who he was, whether he lived there, and whether there was anything the officer needed to know) were consistent with a *Terry* stop and not with police attempts to "strong-arm" or deceive a defendant during formal arrest. *See United States v. Davis*, 530 F.3d 1069, 1082 (9th Cir.2008) (holding that questions consistent with a *Terry* stop during execution of search warrant, including those intended to obtain the identity of the suspect and confirm or dispel officer's suspicions that suspect was involved in marijuana grow operation on the property, did not require *Miranda* warnings). To the extent that any reassurances made to Mumford played a role in his decision to speak to the detective, the statements made in this case are not dispositive of custody. That is, although such reassurances could be possibly relevant to whether a *Miranda* waiver was valid or a particular statement was involuntary, *see People v. Gonzalez–Zamora*, 251 P.3d 1070, 1075 (Colo.2011); *People v. Bostic*, 148 P.3d 250, 257–58 (Colo. App.2006), they are not determinative of whether, at the time he was questioned, Mumford's freedom of movement was restricted to the degree associated with formal arrest. *See U.S. v. Czichray*, 378 F.3d 822, 829 (8th Cir.2004) (stating that, while some degree of coercion is inherent in the interrogation process, coercive aspects of a police interview are largely irrelevant to the determination of whether a person is in custody for purposes of *Miranda*, except where a reasonable person would perceive the coercion as restricting his or her freedom to depart).

¶ 20 The facts of this case are distinguishable from *People v. Moore*, 900 P.2d 66 (Colo. 1995), *People v. Polander*, 41 P.3d 698 (Colo. 2001), and *People v. Holt*, 233 P.3d 1194 (Colo.2010), on which Mumford relies. In each of those cases, the defendants were subjected to pointed questioning about specific incriminating evidence under circumstances in which there was no doubt that they would be arrested and not just briefly detained. In *Moore*, for example, by the time the defendant was questioned about what his wallet contained, police had seized his wallet containing his driver's license and suspected cocaine. *Moore*, 900 P.2d at 69. Similarly, in *Polander*, police had seized a

Crown Royal bag containing suspected cocaine from the back of the van in which the defendant and her fellow passengers had been sitting when an officer asked to whom the bag belonged. *Polander*, 41 P.3d at 701, 705. Likewise, in Holt, before the defendant was questioned, an officer told the defendant that police had a search warrant to seize his computer and were going to search it for suspected child pornography. *Holt*, 233 P.3d at 1196. Thus, in each of these cases the defendant was aware that police had already discovered (or were on the brink of discovering) specific incriminating evidence connected to the defendant, "virtually precluding the possibility of [the defendant's] release from custody short of formal arrest." *See id.* at 1200 (Coats, J., dissenting).

¶ 21 Here, by contrast, at the time that Mumford was questioned, there were no objective circumstances indicating that police already had discovered evidence connected to Mumford virtually precluding the possibility of his release short of formal arrest. Indeed, given that Mumford was aware that police were focused primarily on Timmerman, and that at least one other occupant had already been released, it was by no means clear that Mumford would be arrested or even detained for an extended period of time. In sum, we agree with the court of appeals that, "at the time of his questioning, there was nothing to indicate that Mumford was ultimately going to be arrested rather than simply detained temporarily during a search focused primarily on someone else." *Mumford*, —— P.3d at ——. Under the totality of the circumstances, we conclude that a reasonable person in Mumford's position would not have felt deprived of his freedom of action to a degree associated with a formal arrest. Therefore, Mumford was not in custody for purposes of *Miranda* and his statement was properly admitted at trial.

## IV.

¶ 22 We hold that Mumford was not in custody at the time he made the incriminating statement to Detective Sarkisian. We therefore affirm the judgment of the court of appeals.

Justice HOBBS dissents, and Chief Justice BENDER joins in the dissent.

Justice HOBBS, dissenting:

¶ 23 I disagree with the majority's conclusion that Mumford was not in custody for purposes of *Miranda* at the time he made his statements to the police. Consistent with our precedent, the totality of circumstances indicates that a "reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Hankins*, 201 P.3d 1215, 1218 (Colo.2009).

¶ 24 Although Mumford was not handcuffed or physically restrained and the interview took place in a conversational tone, his freedom of movement was restricted to the degree associated with formal arrest. The police arrived with a warrant to search his home for drugs, officers who had previously drawn weapons told him he was not free to leave, the police guarded him as he sat on the curb with suspects who had admitted to drug use, and they reassured him that if he cooperated, things would go well for him. In my view, based on the totality of circumstances, the police subjected Mumford to custodial interrogation. Both his statement and the evidence discovered because of it should have been suppressed.

¶ 25 The majority supports its conclusion based on six factors: (1) the police drew their guns only briefly; (2) Mumford was not handcuffed or otherwise physically restrained; (3) Mumford was questioned in a "neutral area"; (4) the interview was conducted conversationally; (5) Mumford was not the subject of the original arrest warrant; and (6) the officer's reassurances that nothing bad would happen were made to the group generally. Maj. op. at 957–58, ¶¶ 16–19.

¶ 26 We were presented with the first four of these factors in *People v. Moore*, 900 P.2d 66 (Colo.1995), yet we still found the defendant to be "in custody" in that case. There, officers were present at Moore's home to search the residence for evidence of narcotics trafficking. *Id.* at 68. When the defendant came home, officers initially drew their weapons but holstered them shortly thereafter. *Id.* at 69. A detective showed Moore the

search warrant and advised him that he was not under arrest and was free to leave at any time. *Id.* The detective instructed Moore that, if he did not leave, he should sit on a recliner in the living-room. *Id.* at 68. Moore was not handcuffed. *Id.* The detective then held up Moore's wallet and asked what he would find if he looked inside. *Id.* at 69. Moore responded "three eight-balls." *Id.*

¶ 27 Despite the non-threatening and conversational nature of the interview, the fact that the interview was conducted in Moore's home, and the fact that Moore was not physically restrained and was advised that he was free to leave, we found that Moore was in custody because he was met by armed officers with their guns drawn and his movement was limited to the recliner during the search and questioning with armed officers close by in the residence. *Id.* at 72–73.

¶ 28 As in *Moore*, the interview here was non-threatening, and the court below found (based on conflicting testimony) that Mumford was not handcuffed or otherwise physically restrained at the time of the interview, though a number of armed police officers were nearby. The police here also drew, but later holstered, their weapons and did not have them drawn during the interview. In fact, other circumstances in this case demonstrate a greater degree of confinement than in *Moore:* the police expressly told Mumford that he was not free to leave, his identification was confiscated and not returned, and he was directed to sit on the curb outside his home with other suspects who were handcuffed. Although not physically restrained, his freedom of movement was severely limited. Officers testified that Mumford and the other occupants of the house were "under guard" while they sat on the curb. Given that officers had drawn their weapons during Mumford's first encounter with them, a reasonable person in this situation would not have felt free to leave the officers' presence.

¶ 29 The majority urges that the present case can be distinguished from *Moore* and a similar case, *People v. Polander*, 41 P.3d 698 (Colo.2001), because in those cases, the defendant was questioned about specific incriminating evidence under circumstances that left "no doubt that they would be arrested and not merely briefly detained." Maj. op.

at 958, ¶ 20. The majority supports this distinction with the proposition that Mumford knew he was not the subject of the arrest warrant (as evidenced by the fact that he produced Timmerman when the officers came to the door) and the fact that the detective asked open-ended questions rather than pointing to a specific piece of evidence. *Id.* at 958–59, ¶¶ 18–19, 21.

¶ 30 But, this narrowly drawn distinction does not take into account that the police arrived with two warrants: one to arrest Timmerman and one to search Mumford's home for drugs. While the police searched his home, Mumford was expressly told he was not free to leave and was required to sit on the curb with a group of people (including Timmerman) who had admitted to drug use in the house and who had pointed the police to places in the house where drugs might be found. Thus, Mumford had every reason to believe that the officers would ultimately find the drugs the other occupants admitted to, as well as the drugs he had in his nightstand and he would be arrested. The majority's distinction between this case and *Moore* would require the officers to have questioned Mumford specifically regarding what they would find in the nightstand in order for his statements to be considered "custodial" even though other indicia of custody not present in *Moore* were clearly present in this case. This is inconsistent both with our precedent in *Moore* and the totality of circumstances test in which no one factor should be determinative. *People v. Hankins*, 201 P.3d 1215, 1219 (Colo.2009).

¶ 31 The majority also states that "there were no objective circumstances indicating that police already discovered evidence connected to Mumford virtually precluding the possibility of his release short of formal arrest" and that "it was by no means clear that Mumford would be arrested or even detained for an extended period of time." Maj. op. at 959, ¶ 21. However, the majority's view of the "objective circumstances" at the time of Mumford's detention is not the applicable legal standard. Rather, the legal standard is whether a "reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Hankins*, 201 P.3d at 1218.

¶ 32 Finally, as noted by the dissent in the court of appeals decision, unless the police had grounds to arrest, the detective lacked any legitimate basis for offering Mumford reassurance that "if he cooperated things would go well for him." *People v. Mumford*, —— P.3d ——, —— (Colo.App.2010). Although the majority dismisses the role that the detective's reassurances played in inducing Mumford to speak, a reasonable person would infer from the detective's statement that he was in custody because the police had grounds to arrest him.

Accordingly, I respectfully dissent.

I am authorized to state that Chief Justice BENDER joins in this dissent.